1   David R. Singer (State Bar No. 204699)
    HOGAN LOVELLS US LLP
2   1999 Avenue of the Stars, Suite 1400
    Los Angeles, California  90067
3   Telephone:  (310) 785-4600
    Facsimile:  (310) 785-4601
4   david.singer@hoganlovells.com

5   Sanford M. Litvack (State Bar No. 177721)
    HOGAN LOVELLS US LLP
6   875 Third Avenue
    New York, New York 10022
7   Telephone:  (212) 918-3000
    Facsimile:  (212) 918-3100
8   sandy.litvack@hoganlovells.com

9
    Attorneys for Defendants
10  THE WALT DISNEY COMPANY,
    WALT DISNEY PICTURES,
11  DISNEY ENTERPRISES, INC. and PIXAR

12

13              **UNITED STATES DISTRICT COURT**

14             **CENTRAL DISTRICT OF CALIFORNIA**

15                   **WESTERN DIVISION**

16

| 17  JAKE MANDEVILLE-ANTHONY, an individual, | Case No. CV 11-2137 VBF (JEMx) |
|---|---|
| 18                      Plaintiff, | Complaint Filed:  March 14, 2011 |
| 19             v. | **DEFENDANTS' NOTICE OF MOTION AND MOTION FOR JUDGMENT ON THE PLEADINGS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** |
| 20  THE WALT DISNEY COMPANY, WALT DISNEY PICTURES, DISNEY ENTERPRISES, INC., PIXAR d/b/a PIXAR ANIMATION STUDIOS; and DOES 1-10, inclusive, | |
| 23 | Date:        July 25, 2011 Time:        1:30 p.m. Location:    Courtroom 9 |
| 24                      Defendants. | |
| 25 | Hon. Valerie Baker Fairbank |

1    **PLEASE TAKE NOTICE THAT** on July 25, 2011, at 1:30 p.m., or as soon

2    thereafter as the matter can be heard by the Honorable Valerie Baker Fairbank in

3    Courtroom 9 of this Court, located at 312 N. Spring Street, Los Angeles, California

4    90012, defendants The Walt Disney Company, Walt Disney Pictures, Disney

5    Enterprises, Inc. and Pixar ("Defendants") will, and hereby do, move this Court for

6    judgment on the pleadings and an order dismissing plaintiff Jake Mandeville-

7    Anthony's ("Plaintiff") Complaint with prejudice.

8         This Motion is brought pursuant to Federal Rules of Civil Procedure, Rule

9    12(c) on the following grounds:

10        Plaintiff's First Cause of Action for Copyright Infringement should be

11   dismissed with prejudice for failure to state a claim because the parties' respective

12   works are not substantially similar as a matter of law.

13        Plaintiff's Second Cause of Action for Breach of Implied Contract should be

14   dismissed for failure to state a claim because it is barred by the applicable statute of

15   limitations.

16        This Motion is made following a conference of counsel pursuant to Local

17   Rule 7-3, which took place on June 3, 2011.

18        This Motion is based upon this Notice of Motion and Motion, the attached

19   Memorandum of Points and Authorities, the pleadings and papers on file herein,

20   Plaintiff's purported copyrighted works (which are part of the pleadings and lodged

21   concurrently herewith),

22   //

23   //

24   //

25   //

26   //

27   //

28   //

\\\LA - 022031/000020 - 486744 v10

—2—

1   Defendants' alleged infringing works (which are part of the pleadings and lodged

2   concurrently herewith), and such other matters as may be presented to the Court or

3   otherwise at the hearing.

4

5

6   Date:  June 16, 2011                          HOGAN LOVELLS US LLP

7

8                                           By:_____/s/_____

9                                                David R. Singer

10                                          Attorneys for Defendants
                                            THE WALT DISNEY COMPANY,
11                                          WALT DISNEY PICTURES,
                                            DISNEY ENTERPRISES, INC.
12                                          and PIXAR

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

\\\LA - 022031/000020 - 486744 v10

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# <u>TABLE OF CONTENTS</u>

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ...........................................1

I.          Introduction .................................................................1

II.         Background.....................................................................2

     A.     Defendants' Works .....................................................2

         (1)   *CARS* ...................................................................2

         (2)   *CARS 2* ...............................................................4

         (3)   *CARS Toon:  Mater's Tall Tales* .................5

     B.     Plaintiff's Works ........................................................6

         (1)   *Cookie*...............................................................6

         (2)   *Cars Chaos* ......................................................7

III.       Plaintiff's Copyright Infringement Claims Should Be Dismissed........8

     A.     The Court Can Dismiss Copyright Claims At The Pleading Stage .........................................................................8

     B.     The Parties' Works Are Not Substantially Similar ..............................8

         (1)   Plot, Sequence of Events, and Pace .........................................9

         (2)   Characters ..................................................................13

         (3)   Dialogue ....................................................................18

         (4)   Central Themes ......................................................19

         (5)   Settings ....................................................................20

         (6)   Mood .......................................................................21

IV.      Plaintiff's Breach Of Implied Contract Claim Is Time-Barred..........22

V.       Conclusion ........................................................................23

\\\LA - 022031/000020 - 486744 v10

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

## CASES

4

*Alchemy II, Inc. v. Yes! Entertainment Corp.*,

5
    844 F. Supp. 560 (C.D. Cal. 1994) ....................................................................14

6

*Aliotti v. R. Dakin & Co.*,
    831 F.2d 898 (9th Cir. 1987) .........................................................................14

7

8

*Aurora World, Inc. v. Ty, Inc.*,
    719 F. Supp. 2d 1115 (C.D. Cal. 2009) ............................................................15

9

10

*Buggs v. Dreamworks, Inc.*,
    2010 WL 5790251 (C.D. Cal., Dec. 28, 2010) ...................................................13

11

12

*Campbell v. Walt Disney Co.*,
    718 F. Supp. 2d 1108 (N.D. Cal. 2010) ................................................. 11, 14, 18

13

14

*Cory Van Rijn, Inc. v. California Raisin Adv. Bd.*,
    697 F. Supp. 1136 (E.D. Cal. 1987) ............................................................. 13, 15

15

16

*Funky Films v. Time Warner Ent. Co.*,
    462 F.3d 1072 (9th Cir. 2006) ................................................................. 9, 11, 22

17

18

*Identity Arts v. Best Buy Ent. Svcs. Inc.*,
    2007 WL 1149155 (N.D. Cal., April 18, 2007)............................................ 8, 18

19

*Kouf v. Walt Disney Pictures & Television*,
    16 F.3d 1042 (9th Cir. 1994) ...................................................................... 11, 16

20

21

*Kourtis v. Cameron*,
    419 F.3d 989 (9th Cir. 2005) ...................................................................... 22, 23

22

23

*Mattel, Inc. v. MGA Ent., Inc.*,
    616 F.3d 904 (9th Cir. 2010) ...................................................................... 13, 15

24

25

*Midas Prod., Inc. v. Baer*,
    437 F. Supp. 1388 (C.D. Cal. 1977) ...............................................................15

26

27

*Phillips v. Murdock*,
    543 F. Supp. 2d 1219 (D. Haw. 2008)..............................................................12

28

*Reddy v. Litton Indus., Inc.*,
   912 F.2d 291 (9th Cir. 1990) ...............................................................23

*Rosenfeld v. Twentieth Century Fox Film*,
   2009 WL 212958 (C.D. Cal., Jan. 28, 2009) ......................................12

*Silberstein v. John Does*,
   242 Fed.Appx. 720 (2nd Cir. 2007)....................................................16

*Taylor v. Sturgel*,
   533 U.S. 880 (2008)............................................................................22

*Thomas v. Walt Disney Co.*,
   2008 WL 425647 (N.D. Cal., Feb. 14, 2008),
   *aff'd* 337 Fed.Appx. 694 (9th Cir. 2009) ............................... 11, 13, 14

*Thompson v. California Brewing Company*,
   191 Cal. App. 2d 506 (1961) ...................................................... 22, 23

*Williams v. Crichton*,
   84 F.3d 581 (2d. Cir. 1996)................................................................12

*Zella v. E.W. Scripps Co.*,
   529 F. Supp. 2d 1124 (C.D. Cal. 2007) ....................................... 8, 9, 22

S<span>TATUTES</span>

Cal. Code Civ. Proc. § 339(1) ......................................................... 22, 23

1             <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2  **I.**      **INTRODUCTION**

3         Defendants'[1] 2006 animated motion picture *CARS* is an award-winning

4  commercial success.  Set in a world populated entirely by anthropomorphic cars and

5  other vehicles, it tells the touching story of an arrogant racecar who learns to slow

6  down and appreciate life, love and friendship.  *CARS* was such a hit that Defendants

7  produced a spin-off series of animated shorts, as well as a motion picture sequel that

8  will be released on June 24, 2011.

9         Five years after *CARS* was released, Plaintiff Jake Mandeville-Anthony

10  ("Plaintiff") filed this action claiming Defendants' three *CARS* works are

11  substantially similar to his *Cookie & Co.* ("*Cookie*") and *Cars/Auto-Excess/Cars*

12  *Chaos* ("*Cars Chaos*") works, which he allegedly created twenty years ago, but only

13  registered with the U.S. Copyright Office last year.  Unfortunately for Plaintiff, a

14  comparison of the relevant works destroys his copyright claims.  After reading

15  Plaintiff's works, and watching Defendants' motion pictures, no reasonable person

16  could conclude they are substantially similar.  They simply are not.

17         *Cookie* is a movie script about two Englishmen who drive across Europe, Asia

18  and Australia in a vintage car; *Cars Chaos* is merely a synopsis for a proposed

19  animated television series involving cartoon cars (based on famous real car designs)

20  that race each other.  The only thing Defendants' *CARS* works have in common with

21  *Cookie* is the general, unprotectable concept of car racing.  The only similarity

22  between Defendants' works and *Cars Chaos* is the familiar idea of animated

23  anthropomorphic cars, that is, animated car characters with human characteristics.

24  However, it is well settled that general concepts and ideas like "car racing" and

25  "anthropomorphic cars" are <u>not</u> protectable under U.S. copyright law.  In short,

26  Plaintiff cannot claim a monopoly over all racing or anthropomorphic car stories,

27  _____

28  [1] "Defendants" refers to The Walt Disney Company, Walt Disney Pictures, Disney
Enterprises, Inc. and Pixar.

1  just as Defendants cannot claim a monopoly over all stories about princesses and
2  frogs.  More importantly, an objective comparison of the works conclusively
3  demonstrates that they are completely dissimilar in plot, characters, dialogue, theme,
4  setting and mood.  Anyone who reads and watches the parties' works will
5  immediately recognize that Defendants' works are nothing like those of Plaintiff.

6  Plaintiff's second claim for breach of implied contract fails because it is time-
7  barred by the two-year statute of limitations:  his contract claim accrued in 2006
8  when *CARS* was released, and this lawsuit was filed five years later.

9

10  **II.    BACKGROUND**
11  **A.    Defendants' Works**
12  **(1)    *CARS***

13  *CARS* is an animated, family motion picture set in an imaginary world
14  populated entirely by anthropomorphic, talking cars and other vehicles.  The motion
15  picture opens with the last race of the Piston Cup, a NASCAR-type race in which
16  the picture's hero, Lightning McQueen, is vying for first place.  McQueen is a
17  young, hotshot racing sensation who wants to be the first "rookie" to win the
18  championship.  He is arrogant, self-centered and focused only on speed, winning,
19  and gaining a lucrative sponsorship deal with the Dinoco racing team owned by Tex,
20  a Cadillac oil magnate.  After alienating his teammates and ignoring the advice of
21  his pit crew, McQueen ends the race in a three-way tie.  A tie-breaker is scheduled
22  for one week later in Los Angeles.  But when McQueen's agent offers him free
23  tickets to the race for his friends, we learn that despite his popularity among fans,
24  McQueen has no real friends.

25  Desperate to win the tie-breaker, and eager to start practicing in California as
26  soon as possible, McQueen selfishly prods Mack, his transport truck, to drive
27  through the night even though Mack is tired.  An accident ensues when Mack falls
28  asleep on the interstate, causing McQueen to be released from the trailer and

—2—

1    dumped onto the highway.  Mack, oblivious to what has happened, drives on
2    towards California.  As McQueen blindly chases after Mack in the dark (racecars
3    have no headlights), he speeds through Radiator Springs, a forgotten desert town on
4    old Route 66.  The Sherriff sees him speeding and chases him until McQueen
5    crashes into a bed of flowers, a tire store and barbed wire, and drags the town
6    monument down from its pedestal, tearing up and destroying the town's only road.

7        After being arrested, McQueen appears in court before a crusty judge named
8    Doc Hudson (a blue Hudson Hornet from the 1950's voiced by Paul Newman).  The
9    town prosecutor, Sally Carrera (a beautiful blue 2002 Porsche), convinces the judge
10   to sentence McQueen to repair the town's road before he leaves for California.

11       The heart of the motion picture takes place in Radiator Springs, where the
12   stranded McQueen is forced to repave the road and contemplate the meaning of life
13   and the importance of friendship.  At first, McQueen acts arrogantly towards the
14   small-town residents who are oblivious to his fame.  He belittles the town's rusty,
15   dilapidated tow truck, Mater, despite Mater's child-like infatuation with him.  Doc
16   Hudson distrusts McQueen and does not like his "type" (*i.e.*, arrogant racecar).
17   Sally disdains McQueen's arrogance and initially rebuffs his romantic advances.

18       Eventually, McQueen begins interacting with the colorful characters of
19   Radiator Springs and learns to admire them.  He discovers there is more to life than
20   winning trophies and becoming famous.  He develops a true friendship with the
21   rambunctious but genuine Mater; he and Sally fall in love; and, after discovering that
22   Doc Hudson is once a three-time Piston Cup champion, McQueen grows to better
23   understand him and seeks his valuable mentorship.  McQueen also learns to
24   appreciate the economic struggles – and the sheer beauty – of this once-booming
25   tourist town that fell off the map when Interstate 40 replaced a winding strip of old
26   Route 66 and bypassed Radiator Springs to "save ten minutes" of travel time.  As
27   McQueen's character matures, he begins to give back to the town and its residents.
28   He masterfully repaves the town road, helps Doc Hudson overcome his bitter

1    retirement from racing, and buys products from many of the town's struggling

2    businesses.  For the first time in years, Radiator Springs starts to show signs of life.

3           Meanwhile, the racing world is searching for McQueen (who has been

4    missing for almost one week).  He is eventually located by the news media and

5    whisked off to Los Angeles for the big tie-breaker race.  However, McQueen is a

6    changed car.  His new friends from Radiator Springs have followed him to Los

7    Angeles and formed his pit crew.  After following the advice of his new crew chief,

8    Doc, McQueen is the first to approach the finish line of the race.  But, to the

9    amazement of the spectators and announcers, McQueen screeches to a halt a few

10   inches from the finish line because he has noticed that his nemesis, Chick Hicks, has

11   run another racer, The King, off the track with some dirty tricks.  McQueen turns

12   around to help The King cross the finish line with dignity and, in doing so, sacrifices

13   winning the race.  The crowd cheers McQueen for his selfless act.  Tex, the owner of

14   Dinoco, is impressed and invites McQueen to join the Dinoco team.  McQueen

15   respectfully declines, choosing instead to keep his new team of friends, remain loyal

16   to his original, small-time sponsor, and return to Radiator Springs.

17           **(2)    *CARS 2***

18           In *CARS 2*, we meet Miles Axelrod, a billionaire oil tycoon that recently

19   renounced fossil fuels in favor of renewable energy, converted himself into an

20   electric car, and declared that his life will be devoted to marketing the renewable,

21   clean-burning fuel Allinol.  In support of his mission, Axelrod has organized the

22   "World Grand Prix," a series of three races in Tokyo, Porto Corsa (a fictional city on

23   the Italian Riviera), and London.  The world's fastest cars will participate, and all

24   must use Allinol instead of regular gasoline to support Axelrod's goal of proving the

25   virtues of alternative fuel and ridding the world of "big oil."

26           The hero from *CARS*, Lightning McQueen, enters the World Grand Prix race

27   and invites his best friend, tow truck Mater, to join him on the adventure.  Luigi and

28   Guido (also from *CARS*) accompany McQueen as his pit crew.  From the moment

Mater arrives overseas, he stands out like an unrefined American tourist and embarrasses McQueen.  For example, in Tokyo Mater mistakes wasabi for pistachio ice cream and creates a public spectacle after gulping down the flaming hot mustard.  After being scolded by McQueen (and told to "stop acting like himself"), Mater wanders off and is mistaken for an American superspy by a British Intelligence agent, Finn McMissile, and his associate Holley Shiftwell.  Before long, Mater is caught up in an adventure of international espionage as he and the British spies pursue an evil syndicate of "lemons" – defective cars like Pacers and Gremlins – who appear to be plotting nothing short of world domination.

Meanwhile, McQueen races in the first two legs of the World Grand Prix where he goes head-to-head with an arrogant Formula racer named Francesco Bernoulli.  Bernoulli wins the first race, and McQueen the second.  But, to the surprise of the racing world, some of the strongest competitors in the World Grand Prix suffer exploding engines and cannot finish the race.  As a result of this string of mysterious engine failures, the news media start questioning whether the environmentally-friendly Allinol fuel is to blame.

Before the third and final race begins, Mater, McMissile and Shiftwell unravel the lemons' evil plot and save McQueen from his own brush with death.[2]  In the end, Mater proves to be a skilled detective and develops an unlikely friendship with the sophisticated British agents.  McQueen comes to regret how he treated Mater and realizes that true friends never ask each other to change who they are.

### (3)   *CARS Toon:  Mater's Tall Tales*

*CARS Toon:  Mater's Tall Tales* is a series of nine short animated motion pictures (each a few minutes in length) featuring the characters Mater and Lightning McQueen.  Each short follows the same formula:  Mater (who is prone to

---

[2] Because this brief is a publicly-filed document, and because *CARS 2* has not yet been commercially released in theatres, Defendants are careful not to give away the entire plot.  Defendants will, however, make appropriate arrangements for the Court to view *CARS 2* in its entirety.

exaggeration) tells McQueen a farfetched story about something Mater claims to have done in the past, which is then shown as a flashback.  For example, in one story, Mater claims to have been "Heavy Metal Mater," a pioneer rock star; in another, Mater is "El Materdor," a famous "bulldozer" fighter; in a third story he is "Moon Mater" and travels to the moon.  Each story is met with disbelief by McQueen, but each picture ends with Mater as the hero because, when Mater finishes his story, McQueen witnesses something (usually a reference or character from one of Mater's stories) that suggests Mater's story might have been true.

### B.      Plaintiff's Works

#### (1)    *Cookie*

*Cookie* is a script for a live-action motion picture based on the true-life adventure of Mike Perkins and Brian Mollineaux, two eccentric English businessmen who, in 1988, won a vintage car endurance rally from London to Sydney.  The script chronicles the race from beginning to end, as Mike and Brian drive through various cities and countries in their flashy, yellow, 1924 Vauxhall car that they call "Cookie."  The beginning of the race is a rather commonplace scene of slapstick chaos in which multiple drivers jockey for a lead position, and a number of vintage cars fall apart immediately or crash.  Mike and Brian, who are laidback and apparently in no rush, drive their car slowly and steadily through the chaos.  From that point forward, the story essentially focuses on the long road trip across multiple continents with no competitors in sight.

In the script, Mike and Brian observe foreign landmarks, tell crude jokes, talk about sex and women, and frequently get drunk.  As they pass through different cities, their bright yellow car attracts a lot of attention and intrigues local residents.  They even develop a small following of news media.  Other than a few flat tires, occasional mechanical problems, and delays getting travel visas from some Middle Eastern countries, the long-distance journey is generally smooth.  Indeed, less than

—6—

1   half way through the script, we learn that all of the other racers have been

2   disqualified and that Mike and Brian need only finish the race to win.

3       The drive through Europe is given short shrift; most of the focus is on the two

4   drivers' time in the Middle East (Egypt, Jordan, Saudi Arabia, etc.), India, and the

5   Australian Outback.  While in Bombay, they participate in a local car race, which

6   they win by slowly and steadily progressing after all the other cars crash.

7   Eventually, Mike and Brian arrive in Sydney to much fanfare as they are declared

8   the rally winners.

9                    **(2)**   *Cars Chaos*

10       *Cars Chaos* is a seven-page synopsis of a proposed television series which,

11   according to Plaintiff's own description, features "cartoon characters of all the well

12   known manufactured cars, past and present; involved in a continuous round of races,

13   rallies, and adventures[.]"  The synopsis lists more than 40 proposed characters in

14   alphabetical order with no apparent lead roles.  Each character name is derived from

15   the model and make of the car (*e.g.*, James Aston-Martin is an Aston Martin; Benzol

16   Beetle is a Volkswagen Beetle; and Ms. Thunderbird Ford is, not surprisingly, a

17   Ford Thunderbird).  Plaintiff provides a one- or two-sentence general description of

18   each character that conforms to stereotypes.  For example, Antonio Alfa Romeo is

19   "An Italian romeo, fast & good looking car in a swarthy continental way."

20       *Cars Chaos* lists various general ideas for future scripts of television shows,

21   such as "Races and Rallies to all parts of the world."  The synopsis also puts forth

22   ideas for product merchandising and computer games.

23       The *Cars Chaos* synopsis is followed by a four-page outline for a proposed

24   episode titled "Alpine Antics," in which Plaintiff's various characters compete in a

25   single road race through the Swiss Alps.  The race begins with chaos and is followed

26   by crashes, cars vying for better positions and scenes of cars racing around the Swiss

27   Alps.  The only dialogue consists of a few catch phrases spoken by some of the cars

28   when there is a crash.  The story ends with the winning car crashing when its brakes

1   fail.  *Cars Chaos* includes black and white, two-dimensional hand drawings of ten

2   cartoon car characters.

3

4   **III.   PLAINTIFF'S COPYRIGHT INFRINGEMENT CLAIMS SHOULD BE DISMISSED**

5         **A.   The Court Can Dismiss Copyright Claims At The Pleading Stage**

6         It is well-settled that the issue of substantial similarity in a copyright

7   infringement case may be determined by the court as a matter of law at the pleading

8   stage by examining and comparing the relevant works.  *Zella v. E.W. Scripps Co.*,

9   529 F. Supp. 2d 1124, 1130 (C.D. Cal. 2007) (Collins, J.) ("the Ninth Circuit has

10   noted that 'there is ample authority for holding that when the copyrighted work and

11   the alleged infringement are both before the court, capable of examination and

12   comparison, non-infringement can be determined on a motion to dismiss.'"), citing

13   *Christianson v. West Pub. Co.*, 149 F.2d 202, 203 (9th Cir. 1945).  "[J]udgment on

14   the pleadings may be granted where the facts asserted by the non-moving party in its

15   pleadings – including the attached works themselves – and all reasonable inferences

16   from those facts, show the absence of substantial similarity."  *Identity Arts v. Best

17   Buy Ent. Svcs. Inc.*, 2007 WL 1149155, *5 (N.D. Cal., April 18, 2007).[3]

18         **B.   The Parties' Works Are Not Substantially Similar**

19         To state a claim for copyright infringement, a plaintiff must allege, among

20   other things, that "the works at issue are substantially similar in their protected

21   elements."  *Zella*, 529 F. Supp. 2d at 1133.  "To assess substantial similarity as a

22   matter of law, the Court must apply the objective 'extrinsic test.'"  *Id.*, citing *Funky

23   Films v. Time Warner Ent. Co.*, 462 F.3d 1072, 1077 (9th Cir. 2006).  "The extrinsic

24

25   [3] The Court may properly consider the parties' respective works referenced in the
complaint, even though Plaintiff failed to attach copies.  *Zella*, 529 F. Supp. 2d at

26   1128.  Plaintiff's alleged works *Cookie* and *Cars Chaos* are attached to the
concurrently-filed Declaration of David R. Singer, and DVD copies of the *CARS*

27   motion picture and *CARS Toon* animated shorts are being lodged with the Court.  At
the June 20, 2011 Scheduling conference, Defendants will discuss suitable

28   arrangements for the Court to view the yet-to-be released *CARS 2*.

1   test focuses on 'articulable similarities between the plot, themes, dialogue, mood,

2   setting, pace, characters, and sequence of events' in the two works." *Funky Films*,

3   462 F.3d at 1077 (internal quotes omitted), citing *Kouf v. Walt Disney Pictures &*

4   *Television*, 16 F.3d 1042, 1045 (9th Cir. 1994).   In applying the test,

> the Court 'must take care to inquire only whether the
> *protectable elements, standing alone*, are substantially
> similar.'  This requires the Court to 'filter out and
> disregard the non-protectable elements in making [the]
> substantial similarity determination.'  The protectable
> elements must demonstrate not just 'similarity,' but
> 'substantial similarity,' and it must be measured at the
> level of concrete 'elements' of each work, rather than at
> the level of the basic 'idea,' or 'story' that it conveys.

10   *Zella*, 529 F. Supp. 2d at 1133, citing *Funky Films*, 462 F.3d at 1077 (internal cites

11   and quotes omitted).  In this case, the protected elements of plot, sequence of events,

12   pace, dialogue, theme, setting, and mood in Plaintiff's works are not similar, let

13   alone "substantially similar," to those in Defendants' works.

### (1)   Plot, Sequence of Events, and Pace

15      The plots of the parties' respective works are wildly different.  *Cookie*

16   revolves around a single long-distance trip, the repetitive immature "road-trip"

17   banter between male chauvinists Mike and Brian, and their random encounters with

18   local residents and foreigners.  The story chronicles their trip like a diary, and has no

19   basic plot complications other than finishing the race.  Action never builds from one

20   scene to the next; instead, the story moves from one location to another.  The pace of

21   *Cookie* is slow and takes place over many months.  There is no suspense because the

22   story is based on real events and early on it is revealed that all other racers have been

23   disqualified.  In the final scene, Mike and Brian win as expected.

24      Plaintiff's second work, *Cars Chaos*, does not even have a plot.  The synopsis

25   merely proposes very general ideas like "Races and Rallies to all parts of the world,"

26   "[w]ould be love affairs, national friendships and rivalries," and "obstacles likely to

27   be encountered" in particular parts of the world like "camels in Arabia, elephants in

28

1   India, kangaroos in Australia, [and] skiers and snow drifts in Switzerland."  The

2   synopsis never spells out any specific action, problem, conflict or plot.

3       The *Cars Chaos* outline for a possible television episode titled "Alpine

4   Antics" describes a single, short, car race through the Swiss Alps.  Other than

5   winning the race and avoiding crashes, there are no conflicts or hurdles for the

6   characters to overcome, and no resolutions of any kind.  In short, there is no story,

7   let alone a protectable story.  Plaintiff's outline admits as much, stating "most of the

8   detailed storyline and action [will be] blocked out and constructed by the animators"

9   at a later point in time.  The pace of Plaintiff's sample outline is very rapid, lasting

10  only a few minutes.  The final scene is anticlimactic because the winner (Chris

11  Chrysler) is just one of many undeveloped characters that happen to be racing; he

12  has no back-story, no apparent motivation for racing, and the victory has no meaning

13  other than winning one of many random races.

14      In sharp contrast to Plaintiff's works, Defendants' *CARS* works involve

15  complete stories with fully fleshed out plots and multiple sub-plots.  For example,

16  the first *CARS* motion picture is about Lightning McQueen's journey of self

17  discovery.  While the motion picture begins and ends with a rally car race, it is really

18  a story about friendship, falling in love, and being part of a community.  *CARS 2*

19  involves three car races in Tokyo, Italy, and England, but as the plot develops, the

20  races themselves – and who wins them – are of minor consequence to the story

21  which focuses instead on good cars triumphing over evil cars, and Mater's

22  entanglement in an international spy operation.  The *CARS Toon* shorts play on the

23  developed personalities and deep friendship of Mater and McQueen and, as

24  described above, follow a formula that reveals that the seemingly unsophisticated

25  Mater really is a hero who knows what he's talking about.

26      Faced with these stark distinctions, Plaintiff tries to argue that there is

27  substantial similarity because (1) his works, like *CARS 2*, depict international car

28  racing; (2) both parties' works "revolve around the lead character interacting with

1   other cars and finding themselves[,] with a number of events [sic] intermixed to

2   bring about humor and romance and both with the backdrop of a race;" and (3) *Cars*

3   *Chaos* and Defendants' *CARS* works both take place in a world "without humans"

4   inhabited only by anthropomorphic cars.  Cplt., at ¶ 21.  To begin with, Plaintiff's

5   description of his works is patently inaccurate on its face.  However, even if

6   accurate, neither individually, nor in the aggregate, would these claimed similarities

7   remotely add up to the substantial similarity that copyright law requires.  To the

8   contrary, they are, at most, precisely the kind of generic "basic plot ideas" that are

9   not protected.  *Campbell v. Walt Disney Co.*, 718 F. Supp. 2d 1108, 1112-1113

10  (N.D. Cal. 2010) (granting motion to dismiss copyright infringement claims against

11  Disney based on the motion picture *CARS* and holding that basic storyline about "a

12  race-car driver personified by an animated stock car who learns life lessons from an

13  older mentor" is not protectable), citing *Cavalier v. Random House, Inc.*, 297 F.3d

14  815, 824 (9th Cir. 2002); *Thomas v. Walt Disney Co.*, 2008 WL 425647, *4 (N.D.

15  Cal., Feb. 14, 2008) (granting motion to dismiss and finding no substantial similarity

16  between two stories about young, anthropomorphic, talking fish in the ocean that are

17  captured by divers and put in a fish tank), *aff'd* 337 Fed. Appx. 694 (9th Cir. 2009).

18      Indeed, courts have routinely declined protection of ideas far more developed

19  than those Plaintiff is seeking to hang his hat on here.  *See, e.g., Funky Films*, 462

20  F.3d at 1081 (finding no protection for similar plots involving "the family-run

21  funeral home, the father's death, and the return of the 'prodigal son,' who assists his

22  brother in maintaining the family business."); *Kouf v. Walt Disney Pictures &*

23  *Television*, 16 F.3d at 1045-46 (9th Cir. 1994) (finding no protection for similar

24  plots of shrunken kids, the life struggle of kids fighting insurmountable dangers, and

25  random similarities such as "a lawnmower scene, a sprinkler scene, the presence of

26  an attic, danger scenes, concerned parents, and kids sleeping outside overnight.");

27  *Berkic*, 761 F.2d 1293 (finding no protection for similar plots of "criminal

28  organizations that murder healthy young people, then remove and sell their vital

1  organs to wealthy people in need of organ transplants" and the general story of the

2  "adventures of a young professional who courageously investigates and finally

3  exposes, the criminal organization."); *Williams v. Crichton*, 84 F.3d 581, 589 (2d.

4  Cir. 1996) (holding that similarities of a "dinosaur zoo or adventure park, with

5  electrified fences, automated tours, dinosaur nurseries, and uniformed workers . . .

6  are classic *scenes a faire* that flow from the uncopyrightable concept of a dinosaur

7  zoo.").[4]

8      Further, even if Plaintiff could assert a literary monopoly over these general

9  concepts, there would still be no substantial similarity as a matter of law.  In point of

10  fact, the underlying unprotectable concepts are totally dissimilar.  For instance,

11  although Plaintiff notes that Defendants' works are based on the concept of

12  anthropomorphic vehicles in "a world without humans," the same is not true with

13  respect to either of Plaintiff's works.  *Cookie* is a story entirely about two humans

14  engaged in a long race in one car, and while *Cars Chaos* does feature

15  anthropomorphic cartoon cars, it also has humans and a very different plot concept.

16  For example, Plaintiff's very first scene depicts "villagers," "reporters," and

17  "photographers," as well as a "fat Swiss man."  His proposed story also includes

18  animals and refers to "cows" and a "goat herd" in the first few scenes.  Thus, even

19  the non-protectable concepts underlying the parties' plots are different.  *See*

20  *Rosenfeld v. Twentieth Century Fox Film*, 2009 WL 212958, *2 (C.D. Cal., Jan. 28,

21  2009) (finding no substantial similarity as a matter of law between stories about

22  robots where plaintiff's work had human characters and defendant's had no

23  humans).

---

24  [4] Plaintiff also bases his substantial similarity claim on the fact that one of the three
25  alternate titles of his *Cars/Auto Excess/Cars Chaos* synopsis was "Cars."  Not only
   is such a one-word title generic and descriptive, but a claim of copyright
26  infringement cannot be based on titles alone.  *Phillips v. Murdock*, 543 F. Supp. 2d
   1219, 1225 (D. Haw. 2008).  Courts analyzing substantial similarity are especially
27  reluctant to consider the similarity of titles when the titles naturally flow from the
   story's non-protectable basic plot.  *Id.*  Here, Plaintiff's and Defendants' works are
28  both about <u>cars</u>.

1    The parties' use of the non-protectable concept of car racing is also

2    fundamentally different.  Plaintiff's plots revolve around the race itself:  in *Cookie*

3    the whole story is about the main characters racing in a six-month rally; in *Cars*

4    *Chaos* the proposed episode begins when the race begins and ends when the race

5    ends.  By comparison, the races in Defendants' motion pictures are catalysts or

6    backdrops for the main plot and not the focus of the stories themselves.  In *CARS*,

7    Lightning McQueen races at the beginning and end, but spends most of the motion

8    picture stranded in the now-neglected town of Radiator Springs.  In *CARS 2*, the

9    three races – and who wins them – are of little significance to the overall story about

10   espionage, spies, good versus evil and solving the exploding car engines mystery.

11   These differences in structure and sequencing of the non-protectable idea of car

12   racing foreclose any claim of purported similarities.  *See Thomas*, 2008 WL 425647,

13   at *4 (no substantial similarity between two plots where the anthropomorphic fish is

14   captured by humans at the end of plaintiff's story and the beginning of defendant's

15   story).

16   Because the parties' plots are based on different concepts, and because they

17   express those concepts in entirely different ways, there is no similarity between the

18   plots.  Moreover, there is certainly no "substantial similarity" of protected elements.

19   **(2)   Characters**

20   Plaintiff claims there are substantial similarities between the characters drawn

21   or described in *Cars Chaos* and the animated three-dimensional car characters from

22   Defendants' *CARS* works.  But, as discussed above, Plaintiff cannot assert a

23   monopoly over the stock idea of animated, anthropomorphic car characters.  *See*

24   *Cory Van Rijn, Inc. v. California Raisin Adv. Bd.*, 697 F. Supp. 1136, (E.D. Cal.

25   1987) (plaintiffs cannot claim copyright protection in the idea of a humanized raisin

26   character); *Buggs v. Dreamworks, Inc.*, 2010 WL 5790251, *5 (C.D. Cal., Dec. 28,

27   2010) ("the basic plot idea of pests with human attributes getting flushed [down the

28   sink] and [then] saving their communities is not protectable."); *Mattel, Inc. v. MGA*

1   *Ent., Inc.*, 616 F.3d 904, 916 (9th Cir. 2010) ("Mattel can't claim a monopoly over

2   fashion dolls with a bratty look or attitude, or dolls sporting trendy clothing – these

3   are all unprotectable ideas.")  Furthermore, "characters which naturally flow from a

4   'basic plot idea' are 'scenes-a-faire' not protected by copyright."  *Campbell*, 718 F.

5   Supp. 2d at 1115.

6         Here, the fact that Plaintiff's synopsis and Defendants' works contain talking

7   car characters with human features flows directly from the <u>idea</u> of anthropomorphic

8   cars and, as such, is not protectable.  *Thomas*, 2008 WL 425647, at *5 (the fact that

9   both parties' works involved a talking fish was not protectable because it "directly

10  flows from the idea of a young fish discovering the ocean"); *see also*, *Alchemy II,*

11  *Inc. v. Yes! Entertainment Corp.*, 844 F. Supp. 560, 567 (C.D. Cal. 1994) (elements

12  of expression that necessarily flow from an idea are not protectable).  Indeed, for

13  decades cartoons and animated works have featured real-life objects that can talk,

14  have personalities, and express "human" emotion.  No one has a lock on that

15  enormously popular genre.

16        Similarly, the fact that some of the parties' respective car characters share

17  common attributes that flow from a well-known car's make and country of origin

18  does not support Plaintiff's claim.  Anyone animating an Italian sports car would

19  naturally endow it with the personality traits of an Italian racer, just as an animator

20  would give a Rolls Royce the personality traits of a British aristocrat.  Those

21  elements necessarily flow from the idea of creating cars based on hugely famous car

22  designs.  *See Aliotti v. R. Dakin & Co.*, 831 F.2d 898, 901 (9th Cir. 1987) (holding

23  that plaintiff copyright owner of stuffed dinosaur design "may place no reliance

24  upon any similarity in expression resulting from either the physiognomy of

25  dinosaurs or from the nature of stuffed animals"); *Alchemy II*, 844 F. Supp. at 568

26  (owner of copyright in talking teddy bear design cannot protect against copying of

27  design features derived from the non-protectable idea of talking teddy bears).

28

1    Nor can Plaintiff claim substantial similarity based on character traits that are

2    established stereotypes – like a 1950's glamorous girl, an emotional Italian, or a

3    British secret agent – because "there can be no property interest in stereotyped

4    characters." *Midas Prod., Inc. v. Baer*, 437 F. Supp. 1388, 1390 (C.D. Cal. 1977).

5    Yet, this is precisely what Plaintiff argues here.  For example, *Cars Chaos* describes

6    the "James Aston-Martin" character as:  "A James Bond type character.  Every time

7    he crashes instead of saying '0,0, seven,' he says '0,0, blast' in a cool, Sean Connery

8    type voice."  That is Plaintiff's <u>entire</u> written description of the character.  From that,

9    Plaintiff would now claim that no one else can create an animated car character that

10   is a British secret agent.  That, of course, is nonsense and the sort of monopolization

11   of basic concepts which copyright laws prevent.

12    Additionally, Plaintiff readily concedes that his car drawings are themselves

13   mere copies of famous cars designed and built by others.  For example, his James

14   Aston-Martin character is depicted as a hand-drawn, 1965 Aston Martin DB5.

15   Putting aside the fact that Defendants' Finn McMissile spy character is not an Aston

16   Martin (it is an original design), Plaintiff has no standing to sue for copyright

17   infringement of a <u>third party's</u> car design.  *Aurora World, Inc. v. Ty, Inc.*, 719 F.

18   Supp. 2d 1115, 1137 (C.D. Cal. 2009) ("[copyright] protection extends only to those

19   components of a work that are original to <u>the author</u>.") (citation omitted) (emphasis

20   added).

21    In a case such as this, where a creative concept can only be expressed in a

22   limited number of ways, courts impose a <u>heightened</u> burden on plaintiffs alleging

23   copyright infringement.  *Mattel, Inc. v. MGA Ent., Inc.*, 616 F.3d 904, 915 (9th Cir.

24   2010) (plaintiff must show "<u>virtually identical copying</u>") (emphasis added); *Cory*

25   *Van Rijn, Inc.*, 697 F. Supp. at 1140-41 (where similarity of expression necessarily

26   results from a common idea that is "only capable of expression in more or less

27   stereotyped form . . . only <u>exact copying</u> is infringement") (emphasis added)

28

1  (citations omitted).  Plaintiff cannot begin to meet this burden with respect to the

2  anthropomorphic cars in his synopsis.

3      First, Plaintiff depicts all of his cars with headlights that are eyes.  Defendants

4  anthropomorphize their cars by using the entire windshield for the eyes and eyelids,

5  resulting in a completely different stylization than Plaintiff's work.[5]

6      Second, Plaintiff's cars have human-like appendages such as arms and hands

7  (*e.g.*, Stanley Standard, Bertie Bentley).  One of Plaintiff's cars, Miss Thunderbird

8  Ford, even has large breasts.  None of the *CARS* characters has human appendages;

9  instead, their doors and tires twist and bend in subtle ways to mimic human body

10  parts.

11      Third, Plaintiff's cars have hair, eyelashes and eyebrows (*e.g.*, Manny Morris,

12  Miss Thunderbird Ford, Benzol Beetle, Bertie Bentley, James Aston-Martin, and

13  Viktor Volvo).  None of Defendants' cars has hair, eyelashes or eyebrows.

14      Fourth, Plaintiff's cars are simply two-dimensional, black and white, hand

15  drawings.  By contrast, Defendants have created complex three-dimensional, full-

16  color, computer-animated characters (using proprietary software and technology) to

17  create eye-popping, photorealistic car characters.  These cars have glossy paint, tires

18  that look like real rubber, scratches and rust that are highly textured, and shiny

19  chrome surfaces that reflect their surroundings.  No reasonable juror could compare

20  Plaintiff's car drawings to Defendants' artwork and conclude they are anything

21  alike.  *See, e.g., Silberstein v. John Does*, 242 Fed. Appx. 720, 722 (2nd Cir. 2007)

22  (holding that no reasonable juror could find substantial similarity between plaintiff's

23  "crudely drawn two-dimensional, monochromatic, static character" and defendant's

24  "three-dimension[al]" character with "fur, nose, eyes, mouth, and extremities [that]

25  are rendered in lifelike detail and realistic color and shade.")

26

27  _____

28  [5] If anything, the characters in the *CARS* works derive from *Susie the Little Blue Coupe*, a 1952 Disney animated short depicting a similar-looking anthropomorphic car named Susie.

1    By way of example, Plaintiff's complaint alleges that his Manny Morris
2  character is similar to Defendants' Mater character, who appears prominently in
3  *CARS*, *Mater's Tall Tales*, and *CARS 2*.  Cplt. at ¶ 22(d).  This is Plaintiff's Manny
4  Morris character:
5
6
7                          
8
9
10
11
12
13
14
15
16  This is Defendants' Mater character:
17
18
19                         
20
21
22
23
24
25  How Plaintiff can contend these characters are similar is mystifying.  But, going
26  beyond the drawings, Plaintiff's written description of his Manny Morris character is
27  nothing like Mater.  In *Cars Chaos*, Plaintiff describes Manny Morris as: "Small,
28

—17—

1   Morris Mini, Jewish market trader car.  Always out for a deal.  Sets up [a] trailer to

2   sell refreshments in pit stops and breaks between races.  Also buys up second hand

3   car parts to sell to other cars in emergencies after their many crashes and shunts."

4   As seen in the picture above, Manny Morris wears what appears to be a skullcap, has

5   a front fender shaped like a large nose, and keeps his moneybags locked up with a

6   chain.

7          Putting aside Plaintiff's offensive depictions, his Manny Morris character

8   does not remotely resemble Mater.  Mater is an unsophisticated, small-town tow

9   truck with buck teeth and a dilapidated body.  His personality is child-like,

10  hyperactive, and fun.  All he wants is friendship and attention, not money.  More

11  importantly, Mater develops a crucial relationship with Lightning McQueen, who

12  initially ignores Mater before eventually becoming his best friend.  Plaintiff's

13  Manny Morris never develops a lasting relationship with another character.  Indeed,

14  there are no interactions of substance between or among <u>any</u> of Plaintiff's cars other

15  than racing each other.

16         In short, the parties' expressions of the general idea of animated,

17  anthropomorphic cars are extremely different.  Any suggestion that the parties'

18  characters are similar – let alone, substantially similar – "would defy the Ninth

19  Circuit's exhortation that copyright law protects only the *specific* details of an

20  author's rendering of an idea, and not the idea itself."  *Identity Arts v. Best Buy Ent.*

21  *Svcs. Inc.*, 2007 WL 1149155, *16 (N.D. Cal., Apr. 18, 2007), citing *Berkic*, 761

22  F.2d at 1293.

23                   **(3)   Dialogue**

24         To allege similarities in dialogue between the works at issue, a plaintiff must

25  set forth specific examples.  *Campbell*, 718 F. Supp. 2d at 1114 (general allegations

26  about "similar" dialogue and conversations between characters without specific

27  examples cannot be used to support a claim of substantial similarity).   Here,

28  Plaintiff cannot seriously claim any similarity between the dialogue in his works and

–18–

1    those of Defendants.  To begin with, *Cars Chaos* has only <u>four lines</u> of dialogue.  In

2    fact, it is a stretch to even call it "dialogue."  Instead, a few of Plaintiff's car

3    characters merely blurt out occasional "catch phrases" like "Dashed good chap,

4    what?" (Dr. Damien Daimler), "Wizard prang" (Jimmy Jensen), and "0,0 blast"

5    (James Aston-Martin).  These apparent British expressions are not only fleeting, but

6    would likely be meaningless to American audiences.

7         In *Cookie*, Plaintiff's other work, the cars do not even speak.  There is only

8    dialogue between the humans.  And that dialogue is R-rated, crude, immature and

9    crafted to elicit quick laughs.  Plaintiff's characters Mike and Brian are constantly

10   swearing; they refer to each other as "bitch" and they talk incessantly about sex,

11   genitalia and alcohol.  The work is hardly similar to Defendants' *CARS* works,

12   which are intended for a family audience.  Furthermore, Defendants' works consist

13   of fully fleshed-out dialogue, and thoughtful conversations so that audiences can

14   easily forget they are watching anthropomorphic cars rather than people.  In short,

15   Plaintiff cannot show substantial similarity of dialogue between the parties' works.

16              **(4)    Central Themes**

17        Plaintiff's *Cookie* has no broad message.  At most, its theme is the banal

18   "slow and steady wins the race."  There is no moral to the story; no lessons learned.

19   Instead, the main characters seem utterly unchanged by their road trip.  By the end

20   of their journey, they have not grown or changed in any way.  Plaintiff's *Cars Chaos*

21   synopsis about cartoon cars racing and crashing is even more devoid of any

22   particular meaning or message.

23        In stark contrast, Defendants' works convey numerous broad messages and

24   morals.  In *CARS*, Lightning McQueen learns that:  winning isn't everything; there is

25   more to life than fame and fortune; it takes teamwork to succeed; love conquers all;

26   don't judge a car by its body; seemingly simple people can teach you important

27   lessons; and true friends will always be there for you.  *CARS 2* also conveys

28   meaningful morals and messages, like the dangers of depending on fossil fuels; the

1   importance of not asking others to change who they are; and believing in yourself

2   even if others make fun of you.  *CARS Toon* similarly plays on the message that you

3   cannot judge a car by its body, as well as the relationship between McQueen and

4   Mater.

5       In sum, there is no similarity whatsoever between the themes explored by

6   Defendants' works and Plaintiff's works (which essentially have no themes).

7   **(5)    Settings**

8   *Cookie* takes place in 1988.  The long-distance rally takes the characters

9   through England, France, Italy, Switzerland, Greece, Egypt, Jordan, Saudi Arabia,

10  Kuwait, Bahrain, Qatar, Abu Dhabi, Dubai, India, Malaysia, Singapore and

11  Australia.  The *Cars Chaos* synopsis discusses the general concept of developing

12  stories in various international settings, and the single proposed episode actually

13  outlined by Plaintiff is set in the Swiss Alps.  Aside from a few references to

14  "cliffs," "snow drifts," "mountain peaks," and the "Mont Blanc Tunnel," the outline

15  provides virtually no additional details or descriptions of the landscape or setting.

16      By comparison, *CARS* takes place in the present day and is set in an imaginary

17  version of the United States.  The opening and ending sequences take place at

18  NASCAR-like racing circuits; one of them is described as the fictional "Los Angeles

19  International Speedway."  The bulk of *CARS* takes place in Radiator Springs, a

20  fictional highway town on old Route 66 (in "Carburetor County").  Defendants'

21  visual depiction of the American Southwest landscape and scenery is spectacular

22  and almost photographic in its realism and attention to detail.  *CARS* boasts

23  panoramic views of mountains and plateaus (sometimes shaped like hood

24  ornaments), water features, and forests unlike typical animated motion pictures.  The

25  beauty of the landscape – and the poignant story of a small town's decline – is also

26  crucial to the storyline for at least two reasons.  First, it explains why Sally "left the

27  big city" and fell in love with Radiator Springs.  Second, the stunning setting

28  inspires Lightning McQueen to appreciate the world around him.

1   The town itself also plays an important role in *CARS*.  Though the buildings

2   are modeled after real-world structures, upon closer inspection they reveal original

3   designs that flow from the premise of a world inhabited exclusively by cars.  For

4   example, doorways are all large enough to accommodate cars; Flo's Diner serves

5   gas and oil; Sally's motel is a series of oversized orange cones that are also car-

6   ports;  and the doctor's office is a service station.

7   The setting for *CARS 2* is rich with similar details and contains the same

8   fictional twist on real landmarks and buildings adapted for a world inhabited by

9   anthropomorphic cars.  For example, a significant portion of *CARS 2* takes place in

10  Porto Corsa, Italy, a fictional city on the Italian Riviera with massive bridges, rock

11  formations shaped like cars, and casinos where cars can gamble.  Defendants'

12  settings are an original combination of pure fantasy and detailed realism.  They are

13  nothing like the generic settings depicted in Plaintiff's works.

14               **(6)   Mood**

15  The mood of the parties' respective works is also totally different.  *Cookie* is

16  an upbeat "guy movie" about two buddies on a road trip, doing things "guys" are

17  often shown to do on such trips.  Plaintiff uses the well-worn elements of slapstick

18  comedy, sex and car crashes to get laughs.  *Cars Chaos* has a light mood that relies

19  on chaotic car crashes and a few British quips for humor.

20  Defendants' *CARS* works are completely different and take audiences on an

21  emotional ride.  They have innovative comedic scenes, such as when Mater shows

22  McQueen his favorite pastime:  sneaking up on sleeping tractors, scaring them, and

23  watching them helplessly roll onto their backs (a play on "cow-tipping").  *CARS* also

24  has romantic scenes, most notably Sally and McQueen's long drive through the

25  forest and mountains when they are falling in love.  At times, the mood of *CARS* is

26  sad, such as the flashback comparing a once-bustling Radiator Springs to its present-

27  day economic blight, or the scenes in *CARS 2* when the characters are somberly

28  remembering Doc Hudson (voiced by Paul Newman) who has since passed away (a

tribute to the late, great actor).  Additionally, unlike Plaintiff's works, the *CARS* works are full of suspense.  For example, in *CARS 2* Mater and the British spies spend the better part of the story trying to solve a mystery and avert disaster.  In terms of mood, the parties' respective works are nothing alike.

* * *

In summary, applying the extrinsic test for substantial similarity to the parties' works, and analyzing the factors discussed above, conclusively demonstrates that the parties' respective works are dissimilar as a matter of law.  Accordingly, the Court should dismiss Plaintiff's copyright infringement claim with prejudice.  *Zella*, 529 F. Supp. 2d at 1133; *Funky Films*, 462 F.3d at 1077.

## IV.   PLAINTIFF'S BREACH OF IMPLIED CONTRACT CLAIM IS TIME-BARRED

The statute of limitations for breach of implied contract is two years from the date of the alleged breach.  Cal. Code Civ. Proc. § 339(1); *Thompson v. California Brewing Company*, 191 Cal. App. 2d 506, 507 (1961); *Kourtis v. Cameron*, 419 F.3d 989, 1001 (9th Cir. 2005), *abrogated on other grounds*, *Taylor v. Sturgel*, 533 U.S. 880 (2008).  Where, as here, a plaintiff alleges an implied promise by defendants to pay for his idea, the limitations period begins to run on the date defendants first began to use the plaintiff's idea.  *Thompson*, 191 Cal.App.2d at 507.  Specifically, in the case of a purported promise to compensate a plaintiff for a motion picture idea, the Ninth Circuit has held that the claim accrues no later than the date on which the motion picture is released in theatres.  *Kourtis*, 419 F.3d at 1000-01.  Plaintiffs cannot "attempt to extend the statute of limitations based upon a continuing violation theory[.]"  *Id.*

Here, Plaintiff claims there was an implied promise by Defendants to compensate him for his "novel ideas for stories concerning 'anthropomorphic' cars characters."  Cplt. at ¶ 37.  Plaintiff's complaint further alleges that "[i]n or about

June 2006, Defendants released their 'Cars' motion picture worldwide for theatrical exploitation." Cplt. at ¶ 23. Therefore, on the face of the Complaint, Plaintiff's contract claims accrued <u>no later</u> than June 2006 – <u>nearly five years ago</u>. Accordingly, the claim is time-barred as a matter of law. Code Civ. Proc. § 339(1); *Thompson*, 191 Cal. App. 2d at 507; *Kourtis*, 419 F.3d at 1001 (affirming dismissal of complaint as time-barred). Because Plaintiff is bound by the judicial admissions in his Complaint, and because leave to amend would be futile, the implied contract claim should be dismissed with prejudice. *Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296 (9th Cir. 1990) (district court may deny leave to amend when any proposed amendment would be futile because it would require Plaintiff to make allegations inconsistent with prior pleading).

## V.   CONCLUSION

Because a comparison of the parties' works conclusively shows no substantial similarity as a matter of law, the Court should dismiss Plaintiff's First Cause of Action for copyright infringement with prejudice. The Court should also dismiss Plaintiff's Second Cause of Action for breach of implied contract with prejudice because Plaintiff's own allegations conclusively show that it is time-barred.

Date:  June 16, 2011                     HOGAN LOVELLS US LLP


                                         By:_____/s/_____
                                            David R. Singer

                                            Attorneys for Defendants
                                            THE WALT DISNEY COMPANY,
                                            WALT DISNEY PICTURES,
                                            DISNEY ENTERPRISES, INC.
                                            and PIXAR

\\\LA - 022031/000020 - 486744 v10