Nicholas A. Kurtz (SBN 232705)
nkurtz@dglegal.com
DUNLAP, GRUBB & WEAVER, PLLC
199 Liberty St., SW
Leesburg, Virginia 90210
Telephone:   (703) 777-7319
Facsimile:    (703) 777-3656

Attorneys for Plaintiff,
Jake Mandeville-Anthony

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| JAKE MANDEVILLE-ANTHONY, an individual,<br><br>              Plaintiff,<br><br>        v.<br><br>THE WALT DISNEY COMPANY; WALT DISNEY PICTURES; DISNEY ENTERPRISES, INC.; PIXAR d/b/a PIXAR ANIMATION STUDIOS; and DOES 1 - 10, inclusive,<br><br>              Defendants. | CASE NO.: CV 11-2137-VBF(JEMx)<br><br>Judge: Honorable Valerie Baker Fairbank<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>[Declaration of Dr. Lewis Hunter; [Proposed] Order filed concurrently herewith]<br><br><u>Hearing</u><br><u>Date:</u>        August 1, 2011<br><u>Time:</u>        1:30 p.m.<br>Hon. Valerie Baker Fairbank<br>312 N. Spring St., Courtroom 9<br>Los Angeles, California 90012 |

## <u>TABLE OF CONTENTS</u>

I. INTRODUCTION ...................................................................................................... 1

II. STATEMENT OF FACTS ....................................................................................... 1

III. LEGAL ARGUMENT ........................................................................................... 3

    A. Standards on a motion for judgment on the pleadings ................................ 3

    B. Defendants have infringed Plaintiff's copyrights ....................................... 5

        1. Plaintiff's ownership of his Copyrighted Works ................................ 6

        2. Access .................................................................................................. 6

        3. Substantial similarity .......................................................................... 8

            a) The role of access on substantial similarity ............................. 9

            b) The effect of identical titles on substantial similarity .......... 10

            c) Similarities as to plot, sequence of events, and settings ....... 11

            d) Similarities as to theme, mood, and pace ............................. 14

            e) Similarities as to dialogue ..................................................... 16

            f) Similarities as to characters .................................................... 17

            g) Defendants' claimed dissimilarities ..................................... 23

            h) Defendants copied protectable elements .............................. 27

    C. Plaintiff's claim for breach of an implied-in-fact contract is not barred by the statute of limitations .................................................................................. 32

IV. CONCLUSION .................................................................................................... 35

MEMORANDUM OF POINTS AND AUTHORITIES

# TABLE OF AUTHORITIES

**Cases**

*A Slice of Pie Prods., LLC v. Wayans Bros. Entm't*, 487 F.Supp.2d 33
(D. Conn. 2007) ............................................................. 9

*Aliotti v. R. Dakin & Co.*, 831 F.2d 898 (9th Cir. 1987) ................................ *passim*

*Alvarez v. Hill*, 518 F.3d 1152 (9th Cir. 2008) ........................................ 5

*Anderson v. Stallone*, No. 87-0592 WDKGX, 1989 WL 206431
(C.D. Cal. Apr. 25, 1989) ............................................... 35

*Bach v. Forever Living Products U.S., Inc.*, 473 F.Supp.2d 1127
(W.D. Wash. 2007) ................................................... 26-27

*Baugh v. Garl*, 137 Cal.App.4th 737 (2006) ........................................ 34

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007) ............... 3-4

*Berkic v. Crichton*, 761 F.2d 1289 (9th Cir. 1985) ................................... 11, 28

*Bosnich v. Chase Bank USA, N.A.*, No. CV 11-1156 CAS (RZx),
2011 WL 1790106 (C.D. Cal. May 9, 2011) ................................. 4

*Bradbury v. Columbia Broad. Sys., Inc.*, 287 F.2d 478 (9th Cir. 1961) ................ 26

*Campbell v. Walt Disney Co.*, 718 F. Supp. 2d 1108 (N.D. Cal. 2010) ................. 28

*Capcom Co., Ltd. v. MKR Group, Inc.*, No. C 08-0904 RS,
2008 WL 4661479 (N.D. Cal. Oct. 20, 2008) ............................... 5

*Cory Van Rijn, Inc. v. California Raisin Adv. Bd.*, 697 F. Supp. 1136
(E.D. Cal. 1987) ...................................................... 17

*Creighton v. City of Livingston*, 628 F.Supp.2d 1199 (E.D. Cal. 2009) ................ 4

*De Acosta v. Brown*, 146 F.2d 408 (2d Cir. 1944) ................................... 7

*Dreyer's Grand Ice Cream, Inc. v. Ice Cream Distribs. of Evansville, LLC*,
No. 10-00317 CW, 2010 WL 1957423 (N.D. Cal. May 14, 2010) ............. 34

*Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068 (9th Cir. 2000) ....................... 6

*Fleener v. Trinity Broadcasting Network*, 203 F.Supp.2d 1142
(C.D. Cal. 2001) ................................................... 17, 30-31

MEMORANDUM OF POINTS AND AUTHORITIES

1  *Funky Films v. Time Warner Ent. Co.*, 462 F.3d 1072 (9th Cir. 2006) .................. 28

2  *Gaste v. Kaiserman*, 863 F.2d 1061 (2d Cir. 1988) .................................... 7

3  *Green v. Schwarzenegger*, No. CV 93-5893-WMB, 1995 WL 874191

4       (C.D. Cal. July 12, 1995) ......................................................... 33

5  *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539 (1985)............... 26

6  *Harvey Cartoons v. Columbia Pictures Industries, Inc.*, 645 F.Supp. 1564

7       (S.D.N.Y. 1986) ................................................................. *passim*

8  *In re Century 21-RE/MAX Real Estate Advert. Claims Litig.*, 882 F.Supp. 915

9       (C.D. Cal. 1994) ................................................................. 4

10  *Kamar Int'l, Inc. v. Russ Berrie & Co.*, 657 F.2d 1059 (9th Cir. 1981) .................. 7

11  *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042 (9th Cir. 1994)......... 8, 28

12  *Kourtis v. Cameron*, 419 F.3d 989 (9th Cir. 2005) ............................... 32, 34

13  *Landsberg v. Scrabble Crossword Game Players, Inc.*, 736 F.2d 485

14       (9th Cir. 1984) ................................................................. 26

15  *Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001) ....................... 31

16  *Mattel, Inc. v. MGA Ent., Inc.*, 616 F.3d 904 (9th Cir. 2010) ................... 17

17  *McGann v. Ernst & Young*, 102 F.3d 390 (9th Cir. 1996) ......................... 4

18  *McMillan Process Co. v. Brown*, 33 Cal.App.2d 279 (1939) ..................... 34

19  *Meta-Film Assoc., Inc. v. MCA, Inc.*, 586 F.Supp. 1346 (C.D. Cal. 1984)........... 7

20  *Metcalf v. Bochco*, 294 F.3d 1069 (9th Cir. 2002) ........................... 10, 31

21  *Metro-Goldwyn-Mayer, Inc. v. Am. Honda Motor Co., Inc.*, 900 F.Supp. 1287

22       (C.D. Cal. 1995) ............................................................... 14

23  *Micro Star v. Formgen Inc.*, 154 F.3d 1107 (9th Cir. 1998).................... 6

24  *Motown Record Corp. v. George A. Hormel & Co.*, 657 F.Supp. 1236

25       (C.D. Cal. 1987) ............................................................... 5

26  *Phillips v. Murdock*, 543 F. Supp. 2d 1219 (D. Haw. 2008)................... 10

27  *RDF Media Ltd. v. Fox Broad. Co.*, 372 F.Supp.2d 556 (C.D. Cal. 2005)........... 4-5

28  *Repp v. Webber*, 947 F. Supp. 105 (S.D.N.Y. 1996)........................... 6-7

MEMORANDUM OF POINTS AND AUTHORITIES

*Rice v. Fox Broad. Co.*, 330 F.3d 1170 (9th Cir. 2003) ............................................. 9

*Romano v. Rockwell Internat., Inc.*, 14 Cal.4th 479 (1996) ..................................... 33

*Rosenfeld v. Twentieth Century Fox Film*, 2009 WL 212958

    (C.D. Cal., Jan. 28, 2009) ................................................................................. 28

*Schwarz v. Universal Pictures Co.*, 85 F. Supp. 270 (S.D. Cal 1945) .................... 29

*See v. Durang*, 711 F.2d 141 (9th Cir. 1983) ......................................................... 29

*Shaw v. Lindheim*, 919 F.2d 1353 (9th Cir. 1990) ........................ 8, 9, 10, 26, 27, 31

*Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157

    (9th Cir. 1977) ................................................................................................ 6, 8-9

*Silberstein v. John Does*, 242 Fed. Appx. 720 (2nd Cir. 2007) ............................. 18

*Smith v. Jackson*, 84 F.3d 1213 (9th Cir. 1996) .................................................... 5, 8

*Stewart v. Wachowski*, 574 F.Supp.2d 1074 (C.D. Cal. 2005) ................................ 9

*Swirsky v. Carey*, 376 F.3d 841 (9th Cir. 2004) ..................................................... 8, 9

*Three Boys Music Corp. v. Bolton*, 212 F.3d 477 (9th Cir. 2000) ......................... 6, 9

*Thomas v. Walt Disney Co.*, 2008 WL 425647 (N.D. Cal. Feb. 14, 2008) ............. 28

*Thompson v. California Brewing Company*, 191 Cal. App. 2d 506 (1961) ............ 35

*Twentieth Century-Fox Film Corp. v. Stonesifer*, 140 F.2d 579 (9th Cir. 1944) .... 27

*Universal City Studios, Inc. v. Film Ventures Int'l, Inc.*, 543 F. Supp. 1134

    (C.D. Cal. 1982) ............................................................................................... 5-6

*Universal Pictures Co., Inc. v. Harold Lloyd Corp.*, 162 F.2d 354 (9th Cir. 1947) 16

*Walker v. Time Life Films, Inc.*, 784 F.2d 44 (2d Cir. 1986) ................................. 29

*West v. Perry*, No. 2:07CV200, 2009 WL 2225569 (E.D. Tex. July 23, 2009) ....... 9

*Williams v. Crichton*, 84 F.3d 581 (2d. Cir. 1996) ................................................. 28

*Worth v. Selchow & Righter Co.*, 827 F.2d 569 (9th Cir. 1987) ....................... 26-27

**Statutes**

Fed. R. Civ. Proc. 8 ...................................................................................................... 3

Fed. R. Civ. Proc. 12 .................................................................................................... 4

17 U.S.C. § 410 ............................................................................................................ 6

iv

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

Plaintiff Jake Mandeville-Anthony, who created screenplays, treatments, synopses, and character lists for a series of motion pictures or a television series/mini-series featuring cartoon cars characters, appeals to this Court's equitable jurisdiction and discretion to immediately put under the spotlight the true ownership of Defendants' "Cars" franchise.  In comparing Plaintiff's works and Defendants' works, substantial similarities exist.  Additionally, Plaintiff's claim for breach of implied contract is not barred by the statute of limitations, as Defendants only recently breached a material term of that contract.  Therefore, Defendants' motion for judgment on the pleadings should be denied in its entirety.

## II.   STATEMENT OF FACTS

Plaintiff Jake Mandeville-Anthony ("Plaintiff" or "Anthony") conceived of an idea for a series of motion pictures or a television series/mini-series featuring cartoon cars characters as least as early as 1992.  Complaint ¶ 10 [Doc. No. 1]. Beginning in 1992, Plaintiff began drafting screenplays, treatments, synopses, and character lists documenting his cartoon cars characters' stories.  Compl. ¶ 11. Plaintiff's

One of Plaintiff's works was a three part screenplay titled "Cookie & Co." and was based on the true-life adventure by Michael Owen Perkins and Brian Mullineaux, who won the 1988 "London to Sydney Vintage Car Endurance Rally" in a yellow, 1924 open top Vauxhall car called "Cookie."  Compl. ¶ 11.  Plaintiff's "Cookie & Co." is the subject of a valid Certificate of Copyright Registration Number PAu003517273 issued by the Register of Copyrights.  Compl. ¶ 30.

Plaintiff's second work was titled "Cars" (alternatively titled "Auto Excess" or "Cars Chaos") and included a treatment, sample screenplay, synopses, 46 animated cars characters descriptions, 10 cars characters sketches, and a

1

marketing/merchandising plan.  Compl. ¶ 12.  Plaintiff's "Cars" is the subject of a valid Certificate of Copyright Registration Number PAu003517316 issued by the Register of Copyrights.  Compl. ¶ 30.

In or about 1992, 1993, 1994, and 1996, Defendants were given access to Plaintiff's "Cookie & Co." and "Cars" (collectively "Copyrighted Works") when Defendants received in-person presentations from Plaintiff and copies of Plaintiff's Copyrighted Works, personally and via mail, which were retained by the Defendants, having never been returned to the Plaintiff.  Compl. ¶ 13.  On or about January 6, 1993, Plaintiff met in person with and personally delivered copies of his Copyrighted Works to Jim Morris, who held key executive positions with Lucasfilm Limited since 1987.  Compl. ¶ 14.  Mr. Morris joined Defendant Pixar in 2005 and is currently the general manager of Defendant Pixar.  Compl. ¶ 17.  Mr. Morris also received a "Special Thanks" credit in Defendants' "Cars Toon: Mater's Tall Tales" and was recognized in the credits as part of the "Pixar Senior Leadership Team" on Defendants' "Cars 2."  See Doc. No. 31, Ex. 2 (Defendants' "Cars Toon: Mater's Tall Tales" DVD); Doc. No. 38, Ex. A (Defendants' "Cars 2" DVD).

Additionally, starting in 1983, John Lasseter worked at a division of Lucasfilm that became Defendant Pixar when the division was acquired by Apple co-founder Steve Jobs in 1986.  See Compl. ¶¶ 15, 16, 18.[1]  Mr. Lasseter is currently the Chief Creative Officer of Pixar and Walt Disney Animation Studios, and he is one of the credited directors and writers of Defendants' "Cars" and "Cars 2."  See Doc. No. 31, Ex. 1 (Defendants' "Cars" DVD); Doc. No. 38, Ex. A (Defendants' "Cars 2" DVD); see also Compl. ¶¶ 15, 18.

---

[1]  Certain divisions of Lucasfilm became Defendant Pixar, and later Pixar entered into an agreement with The Walt Disney Company to merge wherein Pixar became a wholly-owned subsidiary of The Walt Disney Company.  See Compl. ¶¶ 16, 19.

MEMORANDUM OF POINTS AND AUTHORITIES

In 2006 Defendants released their "Cars" motion picture worldwide for theatrical exploitation and later in DVD format. Compl. ¶ 23. Defendants Disney Enterprises, Inc. and Pixar are the copyright claimants for Defendants' "Cars" motion picture. Id. In or about 2008, Defendants began releasing an animated short television series featuring the characters from the "Cars" motion picture, entitled "Cars Toons." Compl. ¶ 24. Defendants Disney Enterprises, Inc. and Pixar are the copyright claimants for Defendants' "Cars Toons" works. Id.

Defendants' "Cars" and "Cars Toons" have achieved extraordinary commercial success, earning well over $500 million from its motion picture theatrical and DVD release and an estimated $5 billion in sales or licensing of merchandise and promotional items, including without limitation toys and video games, at the time Plaintiff filed his Complaint. Compl. ¶ 25. To this day, Defendants continue to commercially exploit "Cars," "Cars Toons," and the associated merchandise and promotional items. Compl. ¶ 26.

Defendants' "Cars 2" feature film was theatrically released on June 24, 2011. See Compl. ¶ 27. As shown herein, a comparison of Plaintiff's Copyrighted Works and Defendants' "Cars," "Cars 2," and "Cars Toons," including without limitation the characters, plots, themes, settings, moods, and sequencing of each, reveals that Defendants' "Cars," "Cars 2," and "Cars Toons" are substantially similar to Plaintiff's Copyrighted Works. See Compl. ¶¶ 20-22. Plaintiff has demanded compensation for Defendants' use of his Copyrighted Works to make Defendants' "Cars" franchise, but Plaintiff has not received any compensation. Compl. ¶ 41.

## III.  LEGAL ARGUMENT

### A.  Standards on a motion for judgment on the pleadings

Federal Rule of Civil Procedure 8(a) states that a complaint only requires a "short and plain statement of the claim showing that the pleader is entitled to relief." A complaint must present "enough facts to state a claim to relief that is

1   plausible on its face" and "above the speculative level." *Bell Atlantic Corp. v.*
2   *Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1965 (2007).

3          Federal Rule of Civil Procedure 12(c) provides that any party may move for
4   judgment on the pleadings "after the pleadings are closed, but within such time as
5   not to delay the trial." See Fed. R. Civ. Proc. 12(c).  A motion for judgment on the
6   pleadings brought pursuant to Fed.R.Civ.P. 12(c) provides a means of disposing of
7   cases when all material allegations of fact are admitted in the pleadings and only
8   questions of law remain.  See *McGann v. Ernst & Young*, 102 F.3d 390, 392 (9th
9   Cir. 1996).

10         "In considering a motion for judgment on the pleadings, the Court must
11  accept all material allegations of the complaint as true and view them in the light
12  most favorable to the plaintiff." *In re Century 21-RE/MAX Real Estate Advert.*
13  *Claims Litig.*, 882 F.Supp. 915, 920-21 (C.D. Cal. 1994) (citing *NL Industries v.*
14  *Kaplan*, 792 F.2d 896, 898 (9th Cir. 1986)); see *Bosnich v. Chase Bank USA, N.A.*,
15  No. CV 11-1156 CAS (RZx), 2011 WL 1790106 at *2 (C.D. Cal. May 9, 2011)
16  ("In considering a Rule 12(c) motion, the district court must view the facts
17  presented in the pleadings and the inferences to be drawn from them in the light
18  most favorable to the nonmoving party.") (citations omitted).  "All inferences
19  reasonably drawn from these facts must be construed in favor of the responding
20  party." *Creighton v. City of Livingston*, 628 F.Supp.2d 1199, 1207 (E.D. Cal. 2009)
21  (citing *Westlands Water Dist. v. Firebaugh Canal*, 10 F.3d 667, 670 (9th
22  Cir.1993)).  "Dismissal is proper only if it appears beyond a doubt that the plaintiff
23  can prove no set of facts in support of its claim which would entitle it to relief." *In*
24  *re Century 21-RE/MAX Real Estate Advert. Claims Litig.*, 882 F.Supp. at 921
25  (citing *Sun Savings & Loan Ass'n v. Dierdorff*, 825 F.2d 187, 191 (9th Cir. 1987)).
26         A motion to dismiss a case at the pleadings stage "is generally viewed with
27  disfavor and is rarely granted." *RDF Media Ltd. v. Fox Broad. Co.*, 372 F.Supp.2d
28  556, 560 (C.D. Cal. 2005) (citing *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249

(9th Cir. 1997)).  "[D]ismissal is proper only in extraordinary cases."  Id. at 561

(citing *United States v. Redwood City*, 640 F.2d 963, 966 (9th Cir. 1981)).

Discovery and summary judgment motions, not motions to dismiss, are more

appropriate vehicles for weeding out unmeritorious claims.  See *Alvarez v. Hill*, 518

F.3d 1152, 1157 (9th Cir. 2008) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506,

512, 122 S. Ct. 992, 998 (2002)).[2]


    B.    <u>Defendants have infringed Plaintiff's copyrights.</u>

        To establish copyright infringement, a plaintiff must prove: (1) that the

plaintiff owned the allegedly infringed work; and (2) that the defendant copied the

plaintiff's copyrighted work.  *Smith v. Jackson*, 84 F.3d 1213, 1218 (9th Cir. 1996).

"Copying" is composed of two parts: "(1) circumstantial evidence of the

defendant's access to the copyrighted work; and (2) substantial similarity between

---

[2]  Defendants claim that "[i]t is well-settled that the issue of substantial similarity in a copyright infringement case may be determined by the court as a matter of law at the pleading stage by examining and comparing the relevant works."  Doc. No. 29 at 14:6-8 (citing *Zella v. E.W. Scripps Co.*, 529 F. Supp. 2d 1124, 1130 (C.D. Cal. 2007) and *Identity Arts v. Best Buy Ent. Svcs. Inc.*, Nos. C 05-4656 PJH, C 06-1631 PJH, 2007 WL 1149155 at *5 (N.D. Cal., Apr. 18, 2007), which both rely upon *Christianson v. West Pub. Co.*, 149 F.2d 202, 203 (9th Cir. 1945)).  However, at least one district court has cast some doubt on Defendants' broad proposition.  See *Capcom Co., Ltd. v. MKR Group, Inc.*, No. C 08-0904 RS, 2008 WL 4661479 at *5 (N.D. Cal. Oct. 20, 2008) (stating that "the Ninth Circuit since *Christianson* does not appear to have addressed whether the issue of substantial similarity is susceptible to determination at the motion to dismiss stage").  In fact, it is far from clear that Defendants' motion for judgment on the pleadings is proper in light of Defendants' two separate and distinct arguments relating to two different claims.  Therein, the Court may be persuaded by Defendants' position on one claim but not the other, and it has not been conclusively established that "partial" judgments on the pleadings is proper.  See *Motown Record Corp. v. George A. Hormel & Co.*, 657 F.Supp. 1236, 1237-38 (C.D. Cal. 1987) (acknowledging that Rule 12(c) does not expressly provide for a partial judgment but refusing to "decide the propriety of a 'partial' judgment on the pleadings").

MEMORANDUM OF POINTS AND AUTHORITIES

the copyrighted work and the defendant's work."  *Universal City Studios, Inc. v.*
*Film Ventures Int'l, Inc.*, 543 F. Supp. 1134, 1140 (C.D. Cal. 1982).

### 1.    Plaintiff's ownership of his Copyrighted Works

A copyright registration certificate is prima facie evidence of copyright
validity and ownership.  See 17 U.S.C. § 410(c) ("In any judicial proceedings the
certificate of a registration made before or within five years after first publication of
the work shall constitute prima facie evidence of the validity of the copyright and of
the facts stated in the certificate."); see also *Micro Star v. Formgen Inc.*, 154 F.3d
1107, 1110 (9th Cir. 1998); *Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1075-76
(9th Cir. 2000).

Here, Plaintiff's "Cookie & Co." is the subject of a valid Certificate of
Copyright Registration Number PAu003517273 issued by the Register of
Copyrights, and Plaintiff's "Cars" is the subject of a valid Certificate of Copyright
Registration Number PAu003517316 issued by the Register of Copyrights.  Compl.
¶ 30; see also Doc. Nos. 30-1, 30-2, 30-3.  Therefore, Plaintiff has demonstrated
prima facie evidence of the validity and his ownership in the copyrights of the
Copyrighted Works.

### 2.    Access

"Access is proven when the plaintiff shows that the defendant had an
opportunity to view or to copy plaintiffs' work."  *Sid & Marty Krofft Television
Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1172 (9th Cir. 1977).  To create
an inference of access, a plaintiff only has to show that the defendants had "a
'reasonable opportunity' or 'reasonable possibility' of viewing the plaintiff's
work."  *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 482 (9th Cir. 2000).

A party can establish access by establishing "a particular chain of events
exists by which the alleged infringer might have gained access to the copyrighted

MEMORANDUM OF POINTS AND AUTHORITIES

work." *Repp v. Webber*, 947 F. Supp. 105, 114 (S.D.N.Y. 1996), aff'd in part and rev'd in part, 132 F.3d 882 (2d Cir. 1997) (reversing grant of summary judgment for defendant).  A reasonable possibility of access can be raised by showing that plaintiff's work was transmitted through a third party intermediary who was in a position to transmit it to the copier, where such a person could be a "person with responsibility for the defendant's project, was part of the same work unit as the copier, or contributed creative ideas or material to defendant's work." *Meta-Film Assoc., Inc. v. MCA, Inc.*, 586 F.Supp. 1346, 1355-56 (C.D. Cal. 1984) (discussing and summarizing cases); *Kamar Int'l, Inc. v. Russ Berrie & Co.*, 657 F.2d 1059, 1062 (9th Cir. 1981) (evidence that a third party with whom both plaintiffs and defendants dealt had possession of plaintiffs' work is sufficient to demonstrate access by defendants); *Gaste v. Kaiserman*, 863 F.2d 1061, 1067 (2d Cir. 1988) (plaintiff's theory relying on a "somewhat attenuated chain of events extending over a long period of time and distance" sufficient for jury to find access); *De Acosta v. Brown*, 146 F.2d 408, 410 (2d Cir. 1944) (holding defendant's access was established where plaintiff submitted screenplay to an agent, who thereafter was consulted by defendant as to research details of defendant's work).

Here, Plaintiff has shown that Defendants were sent copies of Plaintiff's Copyrighted Works via mail, which were retained by the Defendants, having never been returned to the Plaintiff.  Compl. ¶ 13.  Additionally, Plaintiff has shown that Defendants were given access to Plaintiff's Copyrighted Works via an in-person presentation from Plaintiff, whereat Plaintiff personally gave copies of the Copyrighted Works to one of Defendants' key executives.  See Compl. ¶¶ 14-19.  More specifically, Plaintiff met in person with and personally delivered copies of his "Cookie & Co." and "Cars" works to the current general manager of Defendant Pixar and received a credit on Defendants' "Cars 2," Jim Morris, who also worked with John Lasseter, current Chief Creative Officer of Pixar and Walt Disney Animation Studios and one of the credited directors and writers of Defendants'

1  "Cars" and "Cars 2," at the time.

2      Therefore, Plaintiff has demonstrated *prima facie* evidence that Defendants

3  had access and the opportunity to view or copy Plaintiff's Copyrighted Works.

4

5                    **3.      Substantial similarity**

6      This Circuit applies a two-part test to compare the similarities of ideas and

7  expression in two works, the extrinsic test and intrinsic test.  *Kouf v. Walt Disney*

8  *Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994).  The extrinsic test

9  considers whether two works share a similarity of ideas and expression as measured

10 by external, objective criteria that is "based on specific expressive elements

11 [,focusing] on 'articulable similarities between the plot, themes, dialogue, mood,

12 setting, pace, characters, and sequence of events' in two works."  *Kouf*, 16 F.3d at

13 1045; *Swirsky v. Carey*, 376 F.3d 841, 845 (9th Cir. 2004).

14     On the other hand, the intrinsic test is a subjective comparison of two works.

15 See *Shaw v. Lindheim*, 919 F.2d 1353, 1357 (9th Cir. 1990) (stating that "the two

16 tests are more sensibly described as objective and subjective analyses of

17 expression" (emphasis in original)).  The intrinsic test measures "substantial

18 similarity in expressions . . . depending on the response of the ordinary reasonable

19 person. . . . [I]t does not depend on the type of external criteria and analysis which

20 marks the extrinsic test."  *Sid & Marty Krofft Television Prods. Inc. v. McDonald's*

21 *Corp.*, 562 F.2d at 1164.

22     In the context of a defendant's motion for summary judgment, only the

23 extrinsic test is relevant.  *Kouf*, 16 F.3d at 1045 (explaining that a plaintiff "avoids

24 summary judgment by satisfying the extrinsic test, which makes similarity of the

25 works a triable issue of fact"); *Smith*, 84 F.3d at 1218 (9th Cir. 1996) ("If plaintiff

26 satisfies the extrinsic test, the intrinsic test's subjective inquiry must be left to the

27 jury and summary judgment must be denied.").

28     Further, expert testimony is "appropriate" for the extrinsic test.  *Sid & Marty*

                                      8

1  *Krofft Television Prods. Inc.*, 562 F.2d at 1164; <u>see also</u> *Stewart v. Wachowski*, 574

2  F.Supp.2d 1074, 1106 n. 130 (C.D. Cal. 2005) (expert was an English professor

3  who had previously testified in several matters regarding substantial similarity);

4  *West v. Perry*, No. 2:07CV200, 2009 WL 2225569, at *5 (E.D. Tex. July 23, 2009)

5  (among other qualifications, expert had a film degree, was an accomplished

6  screenwriter, and had worked as a screen credit arbitrator for the Writer's Guild of

7  America); *A Slice of Pie Prods., LLC v. Wayans Bros. Entm't*, 487 F.Supp.2d 33,

8  41 (D. Conn. 2007) (expert had extensive experience teaching, evaluating, studying,

9  and writing about screen writing).[3]

10

11                a)    <u>The role of access on substantial similarity</u>

12        In applying the extrinsic test, the "inverse ratio rule" must be considered.

13  Under this rule, substantial similarity is inextricably linked to the issue of access.

14  This Court has stated that the inverse ratio rule "require[s] a lower standard of proof

15  of substantial similarity when a high degree of access is shown." *Three Boys*

16  *Music*, 212 F.3d at 485.  Where the defendant concedes that he or she had access to

17  plaintiff's copyrighted work, such a "concession of access ... [is] a prominent factor

18  in [the court's analysis]." *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1178 (9th Cir.

19  2003) (citing *Shaw v. Lindheim*, 919 F.2d 1353, 1361-62 (9th Cir. 1990); *Metcalf v.*

20  *Bochco*, 294 F.3d 1069, 1075 (9th Cir. 2002)).[4]

21  _____

22  [3]  <u>See also</u> *Swirsky v. Carey*, 376 F.3d 841, 847 (9th Cir. 2004) (holding that

23  "district court erred in completely discounting" expert witness where testimony was
    sufficiently objective to be considered in satisfaction of extrinsic test for substantial

24  similarity).

25  [4]  Although the continued viability of the "inverse ratio rule" was questioned in

26  *Aliotti v. R. Dakin & Co.*, 831 F.2d 898, 902 (9th Cir. 1987), the rule was expressly
    reaffirmed in *Shaw*, 919 F.2d at 1361-62 ("Because no subsequent decision has

27  disturbed the access rule established in *Krofft*, we believe that it is the law of this

28  circuit.").

MEMORANDUM OF POINTS AND AUTHORITIES

1    In *Metcalf*, the writer of the infringing work admitted that he received and

2  read three versions of plaintiffs' work and passed it on to the star actor in the

3  infringing work.  There, the court found that "[plaintiffs'] case is strengthened

4  considerably by [defendant's] concession of access to their works."  294 F.3d at

5  1075.  The court stated that if the trier of fact were to believe that the defendants

6  read the scripts, "it could easily infer that the many similarities between plaintiffs'

7  script and defendants' work were the result of copying, not mere coincidence."  *Id.*

8    Here, the word "access" does not appear once in Defendants' motion for

9  judgment on the pleadings.  Defendants have conveniently failed to address the

10  issue of access, hoping to merely sweep the issue under the rug.  Such a concession

11  by Defendants strengthens Plaintiff's case and significantly lessens the standard of

12  proof of substantial similarity necessary to be shown by Plaintiff.  Even without

13  Defendants' silent concession of access, Plaintiff has shown a high degree of access

14  here.  Compl. ¶¶ 13-18.  Therefore, the Court should utilize the inverse ratio rule

15  and require a lower standard of proof of substantial similarity.

16

17          b)    The effect of identical titles on substantial similarity

18    The fact that the two works have identical titles is taken into consideration in

19  determining whether there is substantial similarity of protected expression between

20  two works.  *Shaw v. Lindheim*, 919 F.2d at 1362.[5]

21    Here, the title "Cars" is exactly the same.  Compl. ¶22; see also Declaration

22

23  _____

24  [5]  Defendants' reliance on *Phillips v. Murdock*, 543 F. Supp. 2d 1219, 1225 (D. Haw. 2008) is not persuasive.  There, the plaintiff's claim for copyright infringement relied almost exclusively on the assertion of similarity of titles, as the plaintiff had only seen advertisements for the defendants' work and not the works themselves when she filed her complaint.  That court noted that "[t] here is no copyright infringement merely from the identity or similarity of the titles alone."  Id. at 1225.  Here, the fact that Plaintiff's work and Defendants' works share the exact same title is just one example of the substantial similarities among the works.

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES

1  of Dr. Lewis Hunter filed concurrently herewith ("Dr. Hunter Decl.") at ¶11.

2  Additionally, an inference of copying can be found in the fact that Defendants had

3  also considered the title "The Yellow Car" for their first motion picture.  Compl.

4  ¶22.a.  Plaintiff's "Cookie and Co." work had been professionally bound in book

5  form and had a bright yellow, professionally illustrated cartoon of Cookie the car

6  on the front cover.  Id.; see also Doc. No. 30-1 at p. 4.  Additionally, Defendants

7  had also considered the title "Route 66" for their first motion picture, and within

8  Plaintiff's works, one of the suggested plots is a race on Route 66.  Compl. ¶22.a.

9

10               c)      Similarities as to plot, sequence of events, and settings

11        As this Court has explained, "[t]he test for 'substantial similarity of ideas'

12  compares, not the basic plot ideas for stories, but the actual concrete elements that

13  makes up the total sequence of events and the relationships between the major

14  characters."  Berkic v. Crichton, 761 F.2d 1289, 1293 (9th Cir. 1985).

15        Here, Plaintiff has identified substantial similarities between the plot,

16  sequence of events, and settings between his Copyrighted Works and Defendants'

17  works.  Both plots revolve around the lead character interacting with other cars and

18  finding themselves with a number of events intermixed to bring about humor and

19  romance and both with the backdrop of a race.  Compl. ¶22.n; see also Dr. Hunter

20  Decl. at ¶ 13.

21        The only major races that take place in Defendants' "Cars" is at the very

22  beginning and at the culmination of the film and is a very short race sequence

23  around a circular track.  Hunter Decl. at ¶ 13.  Defendants' story is about events

24  along the way, with the lead character interacting with other cars and finding

25  himself.  Id.  That is also the core of the story in Plaintiff's "Cookie & Co."  Id.  A

26  race is the underlying plot, but the core of the story is what happens along the way,

27  with the lead character Cookie, a car regarded as a human by its two human

28  companions, interacting with other cars and the humans interacting with Cookie

1    and other humans.  Id.[6]

2        For more entertainment value, Plaintiff's "Cookie & Co." includes various

3    scenes of comedic chaos and even a little romance, just like Defendants' "Cars."

4    Id.  For example, in Plaintiff's "Cookie & Co." in Part 3, shot 3, at The Maharajah

5    of Forrengial Bogialiaals's Palace, a conversation takes place between the

6    Maharajah and Mike and Brian about the Maharajah's male white Rolls Royce

7    appearing to want to romance Cookie.  Hunter Decl. at ¶ 13; see also Doc. No. 30-2

8    (Plaintiff's "Cookie & Co.") at pp. 42-43.  This is exactly what occurs between

9    Defendants' Lightning McQueen and Sally Carrera in Defendants' "Cars."  Hunter

10   Decl. at ¶ 13.

11       As a further example, in establishing shot 9 of Plaintiff's "Cookie & Co.,"

12   early in the morning many cars race away from London's Hyde Park at the

13   beginning of their race from London to Sydney.  Hunter Decl. at ¶ 13; see also Doc.

14   No. 30-1 (Plaintiff's "Cookie & Co.") at pp. 14-15.  In the establishing shot in

15   Defendants' "Cars," it is late at night when Lightning McQueen enters Radiator

16   Springs for the first time.  Hunter Decl. at ¶ 13.  The basis of both scenes revolve

17   around a fast moving car racing into or away from a new location and getting

18   tangled up in a strong rope or wire.  Hunter Decl. at ¶ 13.  The first major scene of

19   comedic chaos in each of Plaintiff's "Cookie & Co." and Defendants' "Cars" takes

20   place with the car accidentally attached to a rope/wire, dragging things behind it,

21   and wrecking other cards and buildings.  Compl. ¶22.o; see also Hunter Decl. at ¶

22   13.  These two plot incidents border on identical in establishing shots introducing

23   the main characters in a new and significant location.  Hunter Decl. at ¶ 13.

24   Overall, Defendants' "Cars" plot is substantially similar to Plaintiff's "Cookie &

25

26   _____

27   [6]  Also, the backdrop of Route 66 was a major element in Defendants' "Cars,"
     wherein a race on Route 66 was one of the suggested plots in Plaintiff's "Cars."

28   Compl. ¶22.n.

MEMORANDUM OF POINTS AND AUTHORITIES

Co." while incorporating the theme of fully anthropomorphic cars from Plaintiff's "Cars" work.  Id.

Defendants' "Cars 2" plot is also substantially similar to Plaintiff's "Cookie & Co." while incorporating the theme of fully anthropomorphic cars from Plaintiff's "Cars" work.  For example, Plaintiff's "Cookie & Co." detailed a race/rally that started in Hyde Park, England, proceeded through Europe, and Part 2 ended in South East Asia.  Compl. ¶22.n; see also Dr. Hunter Decl. at ¶ 19. Defendants' "Cars 2" commences in South East Asia (Japan), travels to Italy, and ends the race/rally not just in London, but one specific place in London: Hyde Park. Id.  As with "Cookie & Co.," local races and traffic incidents occur along the way. Id.  Thus, the route of Defendants' "Cars 2" is all but identical to Plaintiff's Part One and Two of "Cookie & Co.," except that Defendants' "Cars 2" has simply done it in reverse.  Dr. Hunter Decl., ¶ 19.[7]

Further, Defendants' "Cars 2" involves an espionage/spy action adventure theme for additional excitement, revolving around a James Bond type character and his Miss Moneypenny assistant.  Compl. ¶22.p; see also Dr. Hunter Decl. at ¶ 17. Those two characters were exactly as detailed in Plaintiff's original list of 46 character cars, as James Aston-Martin and Jenny Jaguar.  Id.  Defendants' almost identical two characters are Finn McMissile and Holly Shiftwell.  Id.[8]

---

[7]  Interestingly absent from Defendants' final release of "Cars 2" was a planned race through Germany's Black Forest, as stated in John Lasseter's précis and description of Defendants' scheduled release of "Cars 2": "John Lasseter Maps out the World of 'Cars 2,'" given at a press conference at D23 Expo on September 13, 2009, reported by Silas Lesnick (Source: www.comingsoon.net), wherein a car race in the Alps was well delineated in the sample script for Plaintiff's "Cars."  See Compl. ¶22.n; see also Dr. Hunter Decl. at ¶ 10; Doc. No. 38, Ex. A (Defendants' "Cars 2" DVD) (epilogue showing Mater and Lightning McQueen in Switzerland on "Mater Horn").

[8]  As yet another example of the substantial similarities between Plaintiff's

MEMORANDUM OF POINTS AND AUTHORITIES

1    However, Defendants' characters are not a homage to the James Bond

2  characters, who were all human of course, but are almost an exact copy of the two

3  main James Bond characters as anthropomorphic cars versions of James Bond and

4  Miss Moneypenny, in a nonhuman world, a unique and original combination of

5  artistic factors and sources which emanated from the imaginative world of

6  Plaintiff's creativity.  Dr. Hunter Decl. at ¶ 18.  Accordingly, Defendants' homage

7  is not free use homage to James Bond and Miss Moneypenny, but it is a copy of

8  Plaintiff's anthropomorphic cars versions of James Bond and Miss Moneypenny in

9  a non-human world.  Id.

10    Therefore, substantial similarities as to the plot, sequence of events, and

11  settings exist between Plaintiff's Copyrighted Works and Defendants' works.

12

13    d)    Similarities as to theme, mood, and pace

14    In *Metro-Goldwyn-Mayer, Inc. v. Am. Honda Motor Co., Inc.*, 900 F.Supp.

15  1287 (C.D. Cal. 1995), the court granted a preliminary injunction against the

16  infringer, holding that "the mood and pace of both works are fast-paced and involve

17  hi-tech effects, with loud, exciting horn music in the background."  Id. at

18  1298.

19    Here, the most gripping and novel element of Plaintiff's "Cars" was that his

20  cars characters would be "anthropomorphic" (humanoid) with no drivers and, in

21  fact, without humans or reference to humans anywhere in the story or as characters.

22  Compl. ¶21; see also Dr. Hunter Decl. at ¶ 12; Doc. No. 30-3 (Plaintiff's "Cars") at

23

24  Copyrighted Works and Defendants' works, towards the end of Defendants' "Cars

25  2," Defendants' Holly Shiftwell replicates a section from Plaintiff's Alpine Rally in

    Plaintiff's "Cars" where Jimmy Jensen (a prestige British sports car) sprouts wings

26  as he careens over a cliff: "Jimmy's world war two fighter pilot flying goggles

27  come in handy when he flies down the mountain as two wings sprout from the side

    of his car body, enabling him to glide to a soft landing."  Doc. No. 30-3 (Plaintiff's

28  "Cars") at p. 15; compare with Doc. No. 38, Ex. A (Defendants' "Cars 2" DVD).

p. 12 ("The full range of human relationships and adventures would be featured but as the exciting and adventurous lives of various, international cartoon cars."). Defendants' "Cars," "Cars 2," and "Cars Toons" all incorporate this essential element. Id.

In creating such a world of just cars, Plaintiff took this theme at least two steps beyond what had ever come before. Dr. Hunter Decl. at ¶ 12. For example, Herbie the Love Bug, My Mother the Car, and Knight Rider all involved car/human hybrids that allowed the car to take off on its or be in control in some way, each being a real car (not a cartoon) with sometimes a disembodied voice. Id. Each of these otherwise normal cars lived with humans in a world populated by humans. Id. Nor does Plaintiff's "Cars" resemble Disney's 1952 short cartoon "Susie the Little Blue Coupe." Id. Susie was a car with some human characteristics and had a mouth but never spoke. Id. Her thoughts were heard by way of a narrator. Id. She had three dimensional eyes beneath her windshield and very expressive eyelids, while other cars had dots as eyes within their headlamps, creating a confusing and inconsistent concept. Id. This was a world of humans, and Susie and other cars had owners. Id. To add to the inconsistency, although having a human owner in a human world, Susie drove herself. Id. However, when the cars in that work were discarded by their owners and lined up to be sold, all but three became bereft of any human traits or movement. In addition, none of them could speak at any time. Id. This was a human world with cars in it. Id. In contrast, Plaintiff's "Cars" is a world of cars with no humans in it. Id.

Defendants argue that a world of anthropomorphic cars is a general concept and idea not protectable in copyright. Doc. No. 29 at 7:24-25. However, it was Defendants themselves that claimed this as a novelty they had created when describing their motion picture "Cars," stating it was a creative concept unlike other animated movies that have come before: a world without humans, where independent, fully anthropomorphized automobiles are the only inhabitants.

MEMORANDUM OF POINTS AND AUTHORITIES

1  Compl. ¶21.

2      Therefore, substantial similarities exist as to the theme, mood, and pace

3  between Plaintiff's Copyrighted Works and Defendants' works.

4

5              e)      Similarities as to dialogue

6      The comparison of dialogue between two works does not have to be exactly

7  the same.  As this Circuit stated in *Universal Pictures Co., Inc. v. Harold Lloyd*

8  *Corp.*, 162 F.2d 354 (9th Cir. 1947), "an infringement is not confined to literal and

9  exact repetition or reproduction; it includes also the various modes in which the

10 matter of any work may be adopted, imitated, transferred, or reproduced, with more

11 or less colorable alterations to disguise the piracy."  Id. at 360.

12     Here, there is minimal dialogue in the works of both litigants because they

13 are action packed races.  In both Plaintiff's "Cars" and Defendants' "Cars" and

14 "Cars 2," the main character relies heavily on catch phrases.  Doc. No. 30-3 at p. 5

15 (Plaintiff's "Cars") (James Astin-Martin says "0, 0 blast" every time he crashes);

16 see generally (Lightning McQueen's prominent catch phrases of "Float like a

17 Cadillac, sting like a Beemer" and "Ka-Chow"); Doc. No. 38, Ex. A (Defendants'

18 "Cars 2" DVD) ("Ka-Chow" also used as "Ka-Ciao").

19     Plaintiff's dialogue in "Cookie & Co" and his "Cars" sample screenplay is

20 predominately humorous against a background of action scenarios in car races.  See

21 generally Doc. Nos. 30-1, 30-2 (Plaintiff's "Cookie & Co.").  Defendants' dialogue

22 in "Cars" and "Cars 2" is also predominately humorous against a background of

23 action scenarios in car races.  Compl. ¶22.n; see also Dr. Hunter Decl. at ¶ 13.

24     Therefore, substantial similarities exist as to the dialogue between Plaintiff's

25 Copyrighted Works and Defendants' works.

26 ///

27 ///

28 ///

MEMORANDUM OF POINTS AND AUTHORITIES

1            f)     <u>Similarities as to characters</u>

2       Contrary to Defendants' assertion, this is not a case where there is only a

3 narrow range of expression for which the Court should impose a higher burden on

4 Plaintiff. <u>See</u> Doc. No. 29 at 21:21-23. Defendants' reliance on *Mattel, Inc. v.*

5 *MGA Ent., Inc.*, 616 F.3d 904 (9th Cir. 2010) and *Cory Van Rijn, Inc. v. California*

6 *Raisin Adv. Bd.*, 697 F. Supp. 1136 (E.D. Cal. 1987) is disingenuous at best.

7       In *Mattel, Inc. v. MGA Ent., Inc.*, the Ninth Circuit actually found that the

8 sketches at issue, as opposed to the doll sculpt at issue, enjoyed broad copyright

9 protection against substantially similar works because "there's a wide range of

10 expression for complete young, hip female fashion dolls with exaggerated

11 features." *Mattel, Inc. v. MGA Ent., Inc.*, 616 F.3d at 916. There the court

12 ultimately analyzed the sketches under a standard substantial similarities test. <u>Id.</u> at

13 916-917.

14       The citation to *Cory Van Rijn, Inc. v. California Raisin Adv. Bd.*, 697 F.

15 Supp. at 1140-1141 (Doc. No. 29 at 21:24-27) actually cites to dicta of *Harvey*

16 *Cartoons v. Columbia Pictures Industries, Inc.*, 645 F.Supp. 1564, 1571 fn. 9

17 (S.D.N.Y. 1986). The Eastern District ultimately analyzed the characters in *Cory*

18 *Van Rijn, Inc. v. California Raisin Adv. Bd.* pursuant to the standard substantial

19 similarities test set forth in *Krofft*. 697 F. Supp. at 1141-1142.

20       On the other hand, this Court has stated that the medium of books are

21 accorded "thick" copyright protection. *Fleener v. Trinity Broadcasting Network*,

22 203 F.Supp.2d 1142, 1149 (C.D. Cal. 2001) (Baird, J.) (citing *Shaw*, 919 F.2d at

23 1360). There, the Court denied a motion for summary judgment and found that

24 genuine disputes of material facts existed as to whether the defendants' book and its

25 corresponding movie adaptation *The Omega Code* infringed upon the plaintiff's

26 book, *The Omega Syndrome*. "Here we deal with the overlap between

27 comprehensive similarity that is not word-for-word and the lack of protection for

28 general ideas." <u>Id.</u> (citing *Nimmer on Copyright* § 13.03[A][1], at 13-29).

1    Notwithstanding, here, Defendants do not even attempt to explain how there

2    is a narrow range of expression for the characters in their works or Plaintiff's

3    works.  In fact, all of the works contradict Defendants' position.  Plaintiff has

4    delineated over 40 different characters.  <u>See</u> Doc. No. 30-3 (Plaintiff's "Cars").

5    Defendants have dozens of different characters and have two full length motion

6    pictures with different plots.  <u>See</u> Doc. No. 31, Ex. 1 (Defendants' "Cars" DVD),

7    Doc. No. 38, Ex. A (Defendants' "Cars 2" DVD).  The fact that Defendants are

8    now claiming that their own "creative concept can only be expressed in a limited

9    number of ways" severely undermines their credibility.  Doc. No. 29 at 21:21-23.[9]

10    Further, substantial similarity can be found where character traits are split

11    between two or more infringing characters. <u>See</u> *Universal City Studios, Inc. v. Film*

12    *Ventures Int'l, Inc.*, 543 F.Supp. at 1137-38 (finding that the local shark expert in

13    the film "Great White" constituted a combination of the shark expert and the local

14    police chief in "Jaws").

15    Here, in both Plaintiff's Copyrighted Works and Defendants' works, the

16    characters are the foundations of the works.  The following examples highlight the

17    substantial similarities between the works' characters:

18

19    _____

    [9]  In conducting an analysis of the similarities between Plaintiff's and Defendants'

20    characters, Defendants' argument that Plaintiff is somehow attempting to gain a

21    "monopoly over the stock idea of animated, anthropomorphic car characters" is
    without any basis, and the cases cited by Defendants for this proposition are not

22    relevant.  Doc. No. 29 at 19:22-23.  Plaintiff has alleged specific characters in the

23    works that are substantially similar and has not simply relied upon the general
    similarity that all the works contain anthropomorphic cars characters.  Further, the

24    similarities of characters are just some of the similarities between Plaintiff's and

25    Defendants' works.  Accordingly, Defendants' reliance on *Silberstein v. John Does*,
    242 Fed. Appx. 720 (2nd Cir. 2007) is severely misplaced.  There, the Second

26    Circuit analyzed the "total concept and feel" in finding that a copyrighted cartoon

27    squirrel/rat hybrid was not substantially similar to character in animated movie,
    where that character was the only claimed similarity.  <u>Id.</u> at 722.

28

18

**"Stanley"**

Plaintiff's oldest cartoon car character was named "Stanley."  Compl. ¶22.b; see also Dr. Hunter Decl. at ¶ 14.a.  Defendants used the identical name, "Stanley," for one of their oldest car characters, with a visual appearance substantially similar to Plaintiff's.  Id.[10]  Both characters are drawn as a Model T Ford.  Id.

Plaintiff's Stanley                          Defendants' Stanley

(Doc. No. 30-3 at p. 17)                 (Doc. No. 31, Ex. 1)

 

**The Lead Character**

One of Plaintiff's lead character cars was "James Aston-Martin," a sports car based on the James Bond character.  Compl. ¶22.c; see also Dr. Hunter Decl. at ¶ 14.b.  Defendants' lead character car, "Lightning McQueen," acknowledged by Defendants to have been partially based on Steve McQueen, appears to be an American version of the Plaintiff's lead character car.  Id.

///

///

---

[10]  Defendants also use an identical name of one of Plaintiff's characters in "Cars 2" – both have a character named "Siddeley."  Compl. ¶22.m.

19

Plaintiff's character

(Doc. No. 30-3 at p. 19)

Defendants' Lightning McQueen

(Doc. No. 31, Ex. 1)





**The Supporting Character**

One of Plaintiff's lead character cars was "Manny Morris," a broken down salvage truck. Compl. ¶22.d; <u>see also</u> Dr. Hunter Decl. at ¶ 14.c. Defendants' second lead character car, "Mater," was also a broken down towing and salvage truck. <u>Id.</u> While Defendants attempt to highlight the differences between Plaintiff's "Manny Morris" and Defendants' Mater, Defendants cannot avoid the similarities that both characters run a salvage yard and have similar names and general appearances.

Plaintiff's Manny

(Doc. No. 30-3 at p. 19)

Defendants' Mater

(Doc. No. 31, Ex. 1)





Additionally, in Defendants' "Cars 2," Mater is shown wearing lederhosen wherein Plaintiff's "Cars" featured an anthropomorphic car wearing lederhosen in an Alpine Rally:

20

Plaintiff's character                                    Defendants' Mater

(Doc. No. 30-3 at p. 19)                                 (Doc. No. 38, Ex. A)

   

**The Showgirls**

One of Plaintiff's supporting female character cars was "Miss Thunderbird Ford," a nineteen "fifties," pink, glamorous movie star with big tail fins.  Compl. ¶22.f; see also Dr. Hunter Decl. at ¶ 14.f.  One of Defendants' two supporting "Motoroma Girls" female character cars was "a nineteen fifties, pink, showgirl with big tail fins."  Id.

Plaintiff's character                                    Defendants' Motoroma Girl

(Doc. No. 30-3 at p. 17)                                 (Doc. No. 31, Ex. 1)



Another of Plaintiff's female character cars was "Leticia Lancia," a "beautiful cheesecake, Italian movie star with big front bumpers."  Compl. ¶22.g; see also Dr. Hunter Decl. at ¶ 14.f.  Defendants' "Flo" was their second glamorous

21

1   showgirl animated cartoon car character.  Id.  In character and visual description,

2   these two movie star/showgirls animated cartoon cars characters are substantially

3   similar.  Id.

4

5   **The Italians**

6       One of Plaintiff's supporting character cars was "Fabrizio Fiat," a small

7   Italian male car that gets emotional very easily.  Compl. ¶22.h; see also Dr. Hunter

8   Decl. at ¶ 14.g.  Defendants featured a supporting character car called "Luigi Fiat,"

9   described as big hearted, gregarious, and excitable.  Id.

10      Defendants' "Cars" featured a fast and good looking Italian car called

11  "Michael Shumaker Ferrari."  Compl. ¶22.j; see also Dr. Hunter Decl. at ¶ 14.i.

12  This character is a composite of Plaintiff's two Italian fast and good looking male

13  cars: the visual appearance of Plaintiff's "Frederico Ferrari" and the described

14  personality of Plaintiff's "Antonio Alfa-Romeo."  Id.

15

16  **Other Characters**

17      Additional characters from Plaintiff's "Cars" appear in various works by

18  Defendants, either in the main films or in trailers and bonus features.  As referenced

19  above, Defendants' "Cars 2" involves an espionage/spy action adventure theme

20  revolving around a James Bond type character and his Miss Moneypenny assistant,

21  named Finn McMissile and Holly Shiftwell, which are the same as Plaintiff's James

22  Aston-Martin and Jenny Jaguar.  Compl. ¶22.p.

23      Another of Plaintiff's lead character cars was "Dr. Damien Daimler," an

24  authority figure.  Compl. ¶22.e; see also Dr. Hunter Decl. at ¶ 14.d.  Defendants'

25  third lead character car, "Doc Hudson," is also a doctor and also an authority figure

26  and appears to be an American version of Plaintiff's doctor character car.  Id.[11]

27

28  [11]  In Defendants' "Cars," the flashbacks of Doc Hudson as a young racer resemble

22

Another of Plaintiff's supporting male character cars was "Casper Cadillac," a rich business car past his prime.[12]  Compl. ¶22.i; see also Dr. Hunter Decl. at ¶ 14.h.  One of Defendants' supporting male character cars, "Tex Cadillac," was also a rich business car past his prime.  Id.

One of Plaintiff's cartoon character cars was Bruce Holden, described as a cheery Australian station wagon.  Compl. ¶22.k; see also Dr. Hunter Decl. at ¶ 14.j.  Defendants' unnamed version of Bruce Holden was featured on the Menu page of the 2009 release of the Blue Ray DVD version of Defendants' "Cars."  Id.

One of Plaintiff's cartoon character cars was Toshiro Toyota, described as an aggressive Japanese car who always wants to win, much like a Samurai warrior.  Compl. ¶22.l.  Prominently featured in certain trailers for Defendants' "Cars 2," an extremely aggressive car whose sole aim in life is to win by any means and whose design suggests a Samurai warrior's helmet as the car's roof rack.  See id.

g)    Defendants' claimed dissimilarities.

Defendants highlight a number of differences between their works and Plaintiff's works.  However, Defendants fail to show how many of these differences actually accentuate similarities between the works.  In the end, simply because Defendants' works are more polished does not discredit the substantial similarities

---

Plaintiff's "Ben Buick," described as an athletic American car a bit like a young Burt Lancaster.  Doc. No. 30-3 at p. 6 (Plaintiff's "Cars"); see also Doc. No. 30-3 (Plaintiff's "Cars").

[12]  It also appears that Defendants have taken two human characters from an Italian scene in Plaintiff's "Cookie & Co." and turned them into identical anthropomorphic cars characters in an almost identical scene in Defendants' Cars 2," namely Mr. and Mrs. Scharalli from "Cookie & Co." warmly fill their guests up with their special spaghetti while Mr. and Mrs. Topolino warmly fill their guests up with her special brand of fuel in "Cars 2."  Compare Doc. No. 30-1 at pp. 33-35 to Doc. No. 38, Ex. A (Defendants' "Cars 2" DVD).

MEMORANDUM OF POINTS AND AUTHORITIES

1    between their works and Plaintiff's works.[13]

2        Defendants attempt to characterize differences between Plaintiff's "Cookie &

3    Co." and Defendants' works by stating that "Cookie & Co." revolves around the

4    banter between the two lead, male characters and their encounters with local

5    residents and foreigners.  See Doc. No. 29 at 15:15-18.[14]  Defendants also

6    characterize "Cookie & Co." as lacking in plot complications other than finishing

7    the race, because other racers have been disqualified, and that action never builds

8    from one scene to the next because the story moves from one location to another.

9    Id. at 15:18-23.[15]

10        Defendants fail to highlight that their own characterization of "Cookie &

11   Co." lines up squarely with that of their "Cars 2."  A major plot element of "Cars 2"

12

13   ────────────────

     [13]  It is important to note that, as alleged, Defendants' final motion pictures are

14   derivative works of Plaintiff's Copyrighted Works.  Compl. ¶ 32.

15   [14]  At one point, Defendants criticize Plaintiff's "Cookie & Co." in that the two

16   main characters "observe foreign landmarks, tell crude jokes, talk
     about sex and women, and frequently get drunk frequently get drunk."  Doc. No. 29

17   at 12:22-23.  Defendants failed to highlight how their "Cars 2" involved more than

18   one scene of their main characters drinking cocktails, to the point that Lightning
     McQueen has a "regular" drink.  Doc. No. 38, Ex. A (Defendants' "Cars 2" DVD).

19

20   [15]  Contrary to Defendants' characterization, the lead characters' journey around
     half of the world in "Cookie & Co." is far from smooth, and there are numerous

21   events that make it appear that they will never be able to cross a dessert, cross the

22   Australian outback, get across a vast sea in their car, obtain an essential visa, get
     robbed, etc.  See generally Doc. Nos. 30-1, 30-2 (Plaintiff's "Cookie and Co.").

23   Notwithstanding, Defendants continually contradict themselves in the
     characterization of Plaintiff's works.  For example, first, Defendants state that

24   "Cookie & Co." revolves around the banter between the two lead, male characters

25   and their encounters with local residents and foreigners.  See Doc. No. 29 at 15:15-
     18.  Later, Defendants state that Plaintiff's "plots revolve around the race itself."

26   Doc. No. 29 at 19:1-3.  It is blatantly obvious that Defendants distort their

27   characterization of Plaintiff's works to fit the argument they are making at the time.

28

is whether Lightning McQueen will finish the final race, wherein most all other racers have suffered exploding engines and cannot finish the races.  Doc. No. 29 at 11:12-14; see generally Doc. No. 38, Ex. A (Defendants' "Cars 2" DVD).[16] Further, as stated above, "Cars 2" also moves from one location to another – from Southeast Asia to Italy to London.  Id.  Lastly, a major plot element of "Cars 2" is also the banter between the two lead, male characters – Lightning McQueen and Mater.  Id.

At one point, Defendants criticize Plaintiff's "Cookie & Co." in that the two main characters "observe foreign landmarks, tell crude jokes, talk about sex and women, and frequently get drunk frequently get drunk."  Doc. No. 29 at 12:22-23. Defendants failed to highlight how their "Cars 2" involved more than one scene of their main characters drinking cocktails, to the point that Lightning McQueen has a "regular" drink.  Doc. No. 38, Ex. A (Defendants' "Cars 2" DVD).  Further, Defendants failed to mention that a number of scenes in "Car 2" contain Lightning McQueen and Mater observing foreign landmarks, and "Cars 2" also contains a number of scenes centered on crude jokes (such as Mater supposedly urinating on the floor by leaking fluid) and talking about women (such as Mater discussing how Holly is his girlfriend).  See id.

Overall, Defendants argue that Plaintiff's Copyrighted Works are not as fully developed as Defendants' works.  However, where substantial similarity exists, as it does here, a defendant will not be immunized from liability by reason of the addition of his work of different characters or additional and varied incidents, nor generally by reason of his work proving more attractive or saleable than the

---

[16]  Defendants admit that, in "Cars 2," it does not matter who wins the races.  Doc. No. 29 at 16:18-22.  Defendants previously criticized Plaintiff's "Cars" because the race victory had no meaning (Doc. No. 29 at 16:12-13), and Defendants criticized Plaintiff's "Cookie & Co." because there is no suspense when the lead characters won the race as expected (Doc. No. 29 at 15:21-23).

plaintiff's.  See *Bradbury v. Columbia Broad. Sys., Inc.*, 287 F.2d 478 (9th Cir. 1961), cert. dismissed, 368 U.S. 801 (1961); *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 565 (1985).

Fictional works can be expressed in many different ways; for that reason, two fictional works might have numerous differences, but still be held to be substantially similar.  The Ninth Circuit, in *Landsberg v. Scrabble Crossword Game Players, Inc.*, 736 F.2d 485 (9th Cir. 1984), described how the extrinsic test is somewhat different when it involves fictional works, such as the ones involved in this case:

> Some ideas can be expressed in myriad ways, while others allow only a narrow range of expression. Fictional works generally fall into the first category. The basic idea of a fictional work might be that classic, boy meets girl. This idea can be expressed, as it has been through thousands of years of literature, with infinite variations in setting, sequence of incident, and characterization. An author wishing to write yet another work using the "boy meets girl" idea can choose from a wide range of materials in composing his or her own expression of the idea. Therefore a new work incorporating that idea need not be a verbatim copy or close paraphrase of an earlier work to infringe that work. A resemblance in details of setting, incident, or characterization that falls short of close paraphrase may be enough to establish substantial similarity and infringement.

Id. at 488.  Thus, even if there are different, additional elements in Defendants' works that are not found in Plaintiff's Copyrighted Works, "[n]o plagiarist can excuse the wrong by showing how much of his work he did not pirate."  *Shaw*, 919 F.2d at 1362 (citations omitted).[17]

---

[17] "The question in each case is whether the similarity relates to matter that constitutes a substantial portion of *plaintiff's* work-not whether such material constitutes a substantial portion of defendants work."  *Bach v. Forever Living Products U.S., Inc.*, 473 F.Supp.2d 1127, 1137 (W.D. Wash. 2007) (emphasis in original) (citing 4 Nimmer, *Nimmer on Copyright*, § 13.03[A][2][a] (2006); *Worth v. Selchow & Righter Co.*, 827 F.2d 569, 571 n. 1 (9th Cir. 1987) ("[T]he relevant inquiry is whether a substantial portion of the protectable material in the *plaintiff's*

MEMORANDUM OF POINTS AND AUTHORITIES

1    Lastly, even if none of Plaintiff's elements is remarkably unusual in and of

2    itself, the fact that both Defendants' and Plaintiff's works contain such a large

3    number of similar elements gives rise to an inference of substantial similarity of

4    protected expression.  *Shaw*, 919 F.2d at 1363 (citing the district court's opinion

5    with approval: "the respective plots parallel each other.... [T]he plots in both scripts

6    share a common sequence and rhythm." "Where plot is ... properly defined as 'the

7    "sequence of events" by which the author expresses his "theme" or "idea,"' it

8    constitutes a pattern which is sufficiently concrete so as to warrant a finding of

9    substantial similarity if it is common to both plaintiff's and defendant's works.").

10   Even minor similarities can be considered to bolster a finding that copyrighted

11   work was utilized in a substantial way.  *Twentieth Century-Fox Film Corp. v.*

12   *Stonesifer*, 140 F.2d 579, 583 (9th Cir. 1944).

13   As stated by Dr. Hunter, it is not difficult to see where the inspiration, basis

14   of the plot and the many character cars in Defendants' "Cars" and "Cars 2" have

15   emanated from.  Dr. Hunter Decl. at ¶ 21.  It is clear there are or will be

16   dissimilarities between Plaintiff's works and that of Defendants.  Id.  However, no

17   matter how many dissimilarities there are, they pale in comparison to the

18   quantitative and qualitative substantial similarities that go to the root of the works

19   at issue.  Id.  Those substantial similarities reflect totally in comparison and identity

20   of the original creative expression that emanated from Plaintiff's "Cars" and

21   "Cookie & Co."  Id.

22

23                    h)    Defendants copied protectable elements

24   Defendants continually argue that apparently no element of Plaintiff's

25   Copyrighted Works is protectable.  For example, Defendants state that Plaintiff's

26   claimed similarities are merely "basic plot ideas" that are not protected.  Doc. No.

27   _____

28   work was appropriated-not whether a substantial portion of *defendant's* work was
     derived from plaintiff's work.")).

29 at 17:7-9.  However, the cases relied upon for this proposition are not persuasive.

*Campbell v. Walt Disney Co.*, 718 F. Supp. 2d 1108 (N.D. Cal. 2010) involved an allegedly similar "young mentee-older mentor storyline."  Id. at 1112-1113.  In *Thomas v. Walt Disney Co.*, 2008 WL 425647 (N.D. Cal. Feb. 14, 2008) both works included nothing more than stories of young fish in the ocean that are captured by divers and put in a fish tank.  Id. at *3.

In *Funky Films v. Time Warner Ent. Co.*, 462 F.3d 1072 (9th Cir. 2006) one work was a murder mystery while the other explored intra-family relationships, with both involving the return of a "prodigal son" and a family funeral business. Id. at 1078.  *Kouf v. Walt Disney Pictures & Television*, 16 F.3d at 1045-46 (9th Cir. 1994) likewise involved one work that was decisively dark compared to a lighthearted family film, where the main claimed similarity was the concept that the main characters were shrunk in size.[18]  Lastly, the Court noted in *Berkic v. Crichton*, that many of the similarities claimed by the plaintiff were so general as to be unprotectible – "depictions of the small miseries of domestic life, romantic frolics at the beach, and conflicts between ambitious young people on one hand, and conservative or evil bureaucracies."  761 F.2d at 1294.[19]

In all of those cases, the plaintiffs attempted to relate one generic plot element or theme to the defendants' works.  Here, Plaintiff has provided concrete elements that collectively make up the total sequence of events and the

---

[18]  *Rosenfeld v. Twentieth Century Fox Film*, 2009 WL 212958 (C.D. Cal., Jan. 28, 2009) also involved one work that was decisively dark compared to a lighthearted family film, where the main claimed similarity was the use or robots.

[19]  *Williams v. Crichton*, 84 F.3d 581 (2d. Cir. 1996) is of no value, as there the Second Circuit primarily analyzed the "total concept and feel" of the works where the defendants' works were "high-tech horror stories" compared to the plaintiff's children's books.  Id. at 589.

MEMORANDUM OF POINTS AND AUTHORITIES

1  relationships between the major characters.  As shown above, Defendants have

2  combined the precise international racing plot from Plaintiff's "Cookie & Co."

3  (though done exactly in reverse) and combined it with specific elements of

4  Plaintiff's "Cars," namely the spy/espionage theme and characters in a world of

5  anthropomorphic cartoon car characters.  Contrary to Defendants' assertion, these

6  elements amount to much more than a basic plot idea about car racing.

7        Further, Plaintiff's claimed substantial similarities are not *scenes-a-faire*.

8  *Scenes-a-faire* are "stock scenes or scenes that [flow] necessarily from common

9  unprotectable ideas."  *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983).  In other

10 words, they are scenes that are logically or conventionally present based on the

11 subject matter or context of the work (*Walker v. Time Life Films, Inc.*, 784 F.2d 44,

12 50 (2d Cir. 1986)), or "scenes which 'must' be done" (*Schwarz v. Universal*

13 *Pictures Co.*, 85 F. Supp. 270, 275-76 (S.D. Cal 1945)).

14       Here, it must again be noted that it was Defendants themselves that claimed a

15 world of anthropomorphic cars as a novelty they had created when describing their

16 motion picture "Cars," stating it was a creative concept unlike other animated

17 movies that have come before: a world without humans, where independent, fully

18 anthropomorphized automobiles are the only inhabitants.  Compl. ¶21.  It is

19 therefore hard to imagine how Defendants are now claiming that any elements

20 arising from anthropomorphized cars are, when present in Plaintiff's Copyrighted

21 Works, not protectable or are *scenes-a-faire*.

22       For example, Defendants argue that "the fact that Plaintiff's synopsis and

23 Defendants' works contain talking car characters with human features flows

24 directly from the <u>idea</u> of anthropomorphic cars and, as such, is not protectable."

25 Doc. No. 29 at 20:6-8 (emphasis in original).  This makes no sense.  First, talking

26 car characters with human features is the definition of anthropomorphic cars, it is

27 not an element that flows from a larger idea.  Second, the common element between

28 Defendants' works and Plaintiff's "Cars" is that the world would be exclusively

MEMORANDUM OF POINTS AND AUTHORITIES

1    populated by anthropomorphic car characters.  Again, Defendants claimed this as a

2    novel element.  If it is protectable when Defendants do it, it must also be

3    protectable when Plaintiff did it years before.

4        This case is more analogous to *Fleener v. Trinity Broadcasting Network*.

5    There, this Court rejected arguments similar to Defendants' that the plaintiff's work

6    merely consisted of unprotectible general ideas and *scenes-a-faire*.  The Court

7    noted that "Defendants' continuing arguments over generality may be the result of a

8    conceptual confusion between ideas, expressions, and the 'ideas' that are used as

9    part of the extrinsic test."  203 F.Supp.2d at 1149.

10        In finding that there were genuine issues of material fact as to the substantial

11    similarity of certain themes, plot elements, and settings, the Court focused on:

12
13            concrete similarities such as Rabbis deciphering a Biblical code
            as they related to the "central theme embodied in the works of using
14            the Bible to provide insight into the developments of the near
            future[,]" the junction of disasters following the adoption of one
15            common world government and one common religion. In relation to
            plot and the sequence of events, the Court found that six common
16            elements were sufficient to permit a jury to find substantial similarity.
            These elements were: Both lead characters become heads of large
17            political organizations based upon the political unification of Europe.
            This position then leads to even more powerful positions. Both lead
18            characters gain respect from advances in food and anti-nuclear
19            technologies. Both lead characters present their anti-nuclear
            technology at a meeting of delegates from various nations of the
20            world. Both lead characters orchestrate a peace treaty between
            nations, which results in global unification. Both lead characters
21            endorse a vision of a common world government modeled on the
22            Roman Empire.  Both lead characters are killed by a gunshot wound
            to the head, and become evil after their resurrection. Further, the
23            wound reappears when the lead character is defeated.
24

25    See id. at 1145-1146 (internal citations omitted).

26        In the end, the Court found that "the significant overlap of important plot

27    developments combined with thematic and setting similarities creates a genuine

28

MEMORANDUM OF POINTS AND AUTHORITIES

1   issue of material fact as to substantial similarity." Id. at 1150.  Further, the Court

2   stated that a genuine issue of material fact as to each element existed because the

3   defendants did not present evidence that the claimed *scenes-a-faire* elements were

4   actually "standard in the genre, much less indispensable."  See id. at 1150-1151.

5       Here, Plaintiff has established significant overlap of important plot

6   developments combined with thematic and setting similarities, along with nearly

7   identical copying of characters.  Further, Defendants have likewise not presented

8   any evidence to compel this Court to conclude that, as a matter of law, any of the

9   elements presented by Plaintiff are standard or indispensable elements, i.e. *scenes-*

10  *a-faire*.  Rather, they base their arguments on their own beliefs and conclusory

11  assumptions.  Such a practice should not persuade the Court to dismiss Plaintiff's

12  case at this juncture.[20]

13      Notwithstanding Defendants' multitude of arguments that Plaintiff's

14  Copyrighted Works contain no protectable elements, "the presence of so many

15  generic similarities and the common patterns...help [plaintiffs] satisfy the extrinsic

16  test." *Metcalf v. Bochco*, 294 F.3d at 1074 ("The particular sequence in which an

17  author strings a significant number of unprotectable elements can itself be a

18  protectable element.").  As the Court in *Shaw* stated, where the main characters are

19  both well dressed, wealthy, self-assured and have expensive tastes, "the totality of

20  the[se] similarities…goes beyond the necessities of [defendants' works'] theme and

21  belies any claim of literary accident."  *Shaw*, 919 F.2d at 1363.

22      As stated by Dr. Hunter, the myriad of choices throughout Plaintiff's works

23  have not been automatic nor taken from what anyone else might have produced

24  from subject matter, whether in the public domain and/or generic items.  Dr. Hunter

25

26

27  [20]  In fact, Defendants cannot present such evidence on a motion for judgment on
    the pleadings.  See generally *Lee v. City of Los Angeles*, 250 F.3d 668, 688-689 (9th

28  Cir. 2001).

31

Decl. at ¶ 22.  Rather, it has been imaginatively and even magically crafted to create the first ever, wonderful world of humanoid cars in a world entirely devoid of humans, with the broadest spectrum of international anthropomorphic cars with the most charming and sometimes humorous names and identity, taken from a combination of life and that special element of imagination which separates the originator from the copyist.  Id.

C.     <u>Plaintiff's claim for breach of an implied-in-fact contract is not barred by the statute of limitations.</u>

Defendants argue that Plaintiff's claim for breach of an implied-in-fact contract is barred by the statute of limitations because the claim was not brought within two years of the June 2006 public release of Defendants' "Cars."  Doc. No. 29 at 28:25-29:6.  Defendants again make an overly broad legal assertion, this time that "the Ninth Circuit has held that the claim accrues no later than the date on which the motion picture is released in theatres."  Doc. No. 28 at 21:23 (citing *Kourtis v. Cameron*, 419 F.3d 989, 1000-01 (9th Cir. 2005)).  However, *Kourtis* did not establish such a doctrine as a matter of law.

The only analysis on this issue provided in *Kourtis* is as follows:

> The latest date upon which their breach-of-contract claims could have accrued is 1991, when Cameron released *Terminator II*, which is more than a decade before this suit was filed. The Kourtises' attempt to extend the statute of limitations based upon a continuing violation theory akin to copyright's continuing infringement doctrine is unavailing because they do not cite-and we are not aware of-any precedent that supports such a result.

419 F.3d at 1000-1001.  *Kourtis* provided no authority for its conclusion.

In fact, the district court decision in the prior case related to *Kourtis* more than casts doubt on Defendants' broad proposition.  Prior to *Kourtis*, this Court was asked to resolve similar issues on the same two works – *Minotaur* and *Terminator*

32

*II* – in *Green v. Schwarzenegger*, No. CV 93-5893-WMB, 1995 WL 874191 (C.D. Cal. July 12, 1995) (Byrne, Jr., C.J.).  There, the Court rejected the defendants' argument that the statute of limitations on a breach of implied contract claim begins to run when a film is publicly released.  Id. at *26-27.

Rather, the Court held that a "plaintiff must have known, or should have known, of the alleged use of his ideas in order for the statute of limitations to commence to run."  Id. at *26.  The Court denied the defendants' motion for summary judgment because the defendants did not prove that the plaintiff should have known of the alleged use of his script in the defendants' film when the film was publicly released – "[t]he fact that 'Terminator 2' was released in theatres to the public does not mean that defendant should have known of the alleged 'use' of his script sooner than he did."  See id. at *26-27.

Here, Defendants likewise have not established when Plaintiff knew, or should have known, the use of his ideas in Defendants' works.  Further, Defendants cannot establish such facts on a motion for judgment on the pleadings, as no such facts are stated in the Complaint.  Therefore, the Court cannot establish, as a matter of law, when the statute of limitations began on Plaintiff's breach of implied contract claim.

Additionally, Defendants conveniently failed to mention "Cars 2" in relation to this claim.  As alleged, Defendants breached the implied contract by failing to compensate Plaintiff for their production of "Cars 2," which was not publically released until June 24, 2011.  See Compl. ¶¶ 27, 40.

"[W]hether the breach is anticipatory or not, when there are ongoing contractual obligations the plaintiff may elect to rely on the contract despite a breach, and the statute of limitations does not begin to run until the plaintiff has elected to treat the breach as terminating the contract."  *Romano v. Rockwell Internat., Inc.*, 14 Cal.4th 479, 489 (1996) (citing 1 Witkin, Summary of Cal. Law, Contracts, §§ 800-801, pp. 723-724); *McMillan Process Co. v. Brown*, 33

Cal.App.2d 279, 285 (1939) ("'The plaintiff was not bound to treat the contract as abandoned on the first breach of it, or on any particular breach, but had his election still to rely upon it. The statute could not begin to run until he made his election to rely no longer upon the contract....'") (citations omitted); *Baugh v. Garl*, 137 Cal.App.4th 737, 747 (2006) ("Here the settlement agreement is still executory, it has no expiration date. The [plaintiffs] were not required to bring an action on the first breach or any particular breach. Thus their action on the contract is not barred by the statute of limitations."); see also *Dreyer's Grand Ice Cream, Inc. v. Ice Cream Distribs. of Evansville, LLC*, No. 10-00317 CW, 2010 WL 1957423 at *2-3 (N.D. Cal. May 14, 2010) (citing *Romano* in holding that the plaintiff's breach of contract claim was not barred by the statute of limitations where the plaintiff gave the defendant the opportunity to cure its earlier defaults on its obligation to pay).

Here, the implied contract between Plaintiffs and Defendants likewise did not have any expiration date on it – having received Plaintiff's ideas, Defendants were required to compensate Plaintiff for the use of Plaintiff's ideas if and when Defendants decided to use them. See Compl. ¶ 38. The pleadings simply do not establish any facts that would bar Plaintiff from being able to continue relying on the contract even after Defendants' initial breaches of "Cars" and "Cars Toons."[21]

---

[21] This case is easily distinguishable from the argument made in *Kourtis*, and referred to by Defendants. See Doc. No. 29 at 28:22-25. There, the plaintiffs attempted to extend the statute of limitations on their breach of implied contract claim based upon a continuing violation theory, akin to copyright's continuing infringement doctrine, for the defendants' continued distribution of one film – *Terminator II. Kourtis*, 419 F.3d at 1000-01. Here, Plaintiff has alleged breaches of the implied contract based on Defendants' development, production, and distribution of three different works – "Cars," "Cars Toons," and "Cars 2." See Compl. ¶ 40. The alleged breaches by Defendants in this case constitute multiple and distinct breaches of one implied contract with ongoing obligations, not the continuation of one breach.

1    Therefore, as a matter of law, the Court cannot establish that Plaintiff's breach of

2    implied contract claim fails in its entirety.

3    Overall, the issue of when the statute of limitations accrued on Plaintiff's

4    breach of implied contract claim is a question of fact.[22]  More instructive is

5    *Anderson v. Stallone*, No. 87-0592 WDKGX, 1989 WL 206431 (C.D. Cal. Apr. 25,

6    1989).  There, the Court refused to establish when a breach of an implied contract

7    claim accrues as a matter of law – "[b]oth sides erroneously assume that this

8    determination can properly be made at the summary judgment stage."  Id. at *2.

9    "The question [of what acts by the defendant constitute a 'use' of the plaintiff's

10    idea such as to satisfy the condition precedent to the defendant's obligation to pay]

11    is ultimately *one of fact*, since it is open to the parties in making a contract to define

12    'use' as they will."  Id. (emphasis in original; citing 3 M. Nimmer, NIMMER ON

13    COPYRIGHT, 16.05[F] at 16:43-16:44 (1988)).

14    Here, at such an early stage of the proceedings, the facts have not been

15    clearly established to determine the parties' intent on when the statute of limitations

16    on Plaintiff's claim for breach of an implied-in-fact contract began.  Therefore, the

17    Court cannot determine, as a matter of law, that Plaintiff's claim is barred.

18

19    **IV.    CONCLUSION**

20    For all of the foregoing reasons, the Court should deny Defendants' motion

21    for judgment on the pleadings.  In the end, Plaintiff is not claiming one or two

22    generic similarities between his works and those of Defendants.  Rather, Plaintiff

23    has shown concrete examples of substantial similarities in plot, themes, dialogue,

24    mood, setting, pace, characters, and sequence of events that establish an inference

25

26    _____

[22]  In Defendants' other cited case for this argument, *Thompson v. California*

27    *Brewing Company*, 191 Cal. App. 2d 506 (1961), that court actually allowed the
plaintiff's case to go to trial on the issue of the parties' intent on the plaintiff's

28    claim for breach of implied contract.

MEMORANDUM OF POINTS AND AUTHORITIES

of copying.  Additionally, Plaintiff's claim for breach of implied contract cannot be

decided as a matter of law at this stage of the case, as factual issues not in front of

this Court must be determined first.  Overall, the Court should allow a jury to

decide whether Plaintiff's works and Defendants' works are substantially similar

enough to warrant a verdict in favor of Plaintiff.

DATED: July 11, 2011                    DUNLAP, GRUBB & WEAVER, PLLC


                                        By:    /s/ Nick Kurtz_____
                                               Nicholas A. Kurtz
                                               Attorneys for Plaintiff,
                                               Jake Mandeville-Anthony

MEMORANDUM OF POINTS AND AUTHORITIES

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 11, 2011, I electronically filed the foregoing MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

David R. Singer
Hogan Lovells US LLP
david.singer@hoganlovells.com

Sanford M. Litvack
Hogan Lovells US LLP
sandy.litvack@hoganlovells.com

*Attorney for Defendants*
*The Walt Disney Company,*
*Walt Disney Pictures,*
*Disney Enterprises, Inc., and*
*Pixar d/b/a Pixar Animation Studios*

/s/ Nick Kurtz
Nicholas A. Kurtz